GEORGE E. SHEPARD, JR., INC. v. KIM, INC.

No. 8018SC881

(Filed 7 July 1981)

1. **Contracts § 27.1— contract for sale of property—mutual assent or counter offer**

   In an action to recover damages for an anticipatory breach of contract for the sale of certain real property to plaintiff realtor, there was no merit to defendant's argument that there was never a meeting of the minds between the parties as to the inclusion or exclusion of the sentence, "Buyer [plaintiff] is purchasing this property in his investment account for a profit," and that the sentence in issue constituted a counter offer by plaintiff, since the evidence tended to show that an offer and acceptence took place when an authorized agent of defendant made an offer to sell by signing a contract of sale and plaintiff accepted it by his execution; the contract contained binding mutual promises of the parties to perform an act in the future in exchange for money; the sentence in issue was not a material change altering the legal relationship of the parties and in no way affected defendant's obligation to pay a 7% commission to the listing broker; and because the sentence did not materially change the legal relationship of the parties, it did not constitute a counter offer by plaintiff.

2. **Corporations § 11— contract for sale of real property—express and apparent authority of agent**

   In an action to recover damages for an anticipatory breach of contract for the sale of real property, defendant could not claim that a sentence inserted in the contract of sale by plaintiff was a counter offer by plaintiff which was not accepted by defendant, since defendant's agent in N.C., by corporate resolution, was authorized to execute the agreement which included the sentence in question with plaintiff; the agent obtained the express approval of defendant's secretary before agreeing to the change; and defendant was estopped from denying the agent's authority because defendant placed her in a position where reasonable persons were justified in assuming that she had authority to act.

3. **Vendor and Purchaser § 1— contract for sale of property—delivery not essential**

   In an action to recover damages for an anticipatory breach of contract for the sale of real property, there was no merit to defendant's contention that, to

Shepard, Inc. v. Kim, Inc.

be valid, a contract to convey land must be delivered, since delivery is not essential for a contract which does not attempt to transfer title.

**4. Vendor and Purchaser § 8— breach of contract to sell property—damages**

In an action to recover damages for an anticipatory breach of contract for the sale of real property, there was no merit to defendant's contention that there was no competent evidence of the fair market value of the property involved, since plaintiff established that assignment of the contract was within the contemplation of the parties; plaintiff assigned the contract to a third party for $85,000; the third party would have been willing to pay more than $85,000 for the contract; and there were other serious negotiations and alternative plans for use of the property.

APPEAL by defendant from *Battle, Judge.* Judgment entered 8 May 1980 in Superior Court, GUILFORD County.[1] Heard in the Court of Appeals 1 April 1981.

George E. Shepard, Jr., Inc. (Shepard, Inc.) seeks to recover damages from Kim, Inc. alleging an anticipatory breach of contract for the sale of certain real property known as the King's Inn Motel (Motel) in Greensboro, North Carolina. Kim, Inc. in its Answer denied the existence of a valid contract. Following a non-jury trial, the court ordered Kim, Inc. to pay Shepard, Inc. $85,000.00 in damages for breaching the contract. Kim, Inc. appeals.

On 21 March 1978, the Motel was listed "for sale, lease or exchange" by Kim, Inc. with the Richardson Corporation.[2] George E. Shepard, Jr., a realtor in Greensboro and President and sole stockholder of Shepard, Inc. became interested in the Motel. Linda Cox, Kim, Inc.'s Vice President in Greensboro, arranged for Shepard to tour the Motel and told him that Alphonse Della-Donna, an attorney in Florida, would make the decisions concerning the sale of the property for Kim, Inc.

Shepard and Della-Donna met in Florida on 27 and 28 June 1978 to negotiate the sale of the Motel. During their discussions, Shepard advised Della-Donna that he (Shepard) was a real estate broker, but that he was not going to claim any of the commission

1. With the consent of all parties, Judgment was entered out of session in Durham, North Carolina.

2. Under the terms of the listing agreement, Richardson Corporation was entitled to a 7% real estate commission in the event of the sale of the property.

from the sale of the Motel; that he was purchasing the property in his investment account for profit; and that he was going to syndicate the property with a group of investors. During the negotiations, Della-Donna telphoned Linda Cox in Greensboro and instructed her to telephone Richardson Corporation and inquire as to the commission payable to Richardson Corporation if the Motel were sold through another broker. Linda Cox made the call as requested. Bryan Clemmons of Richardson Corporation informed Linda Cox that Richardson Corporation's commission would be one-half, or 3.5%, if the property were sold through another broker.

Following the meeting in Florida, Shepard returned to North Carolina and prepared a document, Plaintiff's Exhibit No. 1 (PX1), based on his negotiations with Della-Donna. Shepard sent PX1 to Della-Donna and then deposited $5,000.00 in escrow with High Point Bank & Trust Co. in accordance with PX1. Della-Donna and Shepard had further negotiations over the telephone and agreed on various changes to PX1. The changes agreed upon were incorporated in an 18 July 1978 contract (PX4)[3] prepared by Della-Donna and sent by Air Express Service to the Greensboro airport for execution by Shepard as President of Shepard, Inc. and by Linda Cox as Vice-President of Kim, Inc. A corporate resolution authorizing Linda Cox to sign the contract as Vice President of Kim, Inc. was attached to the contract.

Shepard and Linda Cox met at the airport and examined PX4. At the airport, Linda Cox stated that she had been instructed by Kim, Inc. to add "this is a net, net, net-lease" to paragraph 9 of PX4. Shepard agreed to this addition and then told Linda Cox that he wanted to add the language "[b]uyer is purchasing this property in his investment account for profit" to paragraph 8 of PX4. Linda Cox told Shepard that this additon would have to be approved by Kim, Inc., and consequently, she telephoned Robert Sturrup, a law partner of Della-Donna and Secretary of Kim, Inc., in Florida. Robert Sturrup agreed to Shepard's additon to paragraph 8 and instructed Linda Cox to make the requested change. After the two above-described addi-

---

3. PX4 differed from PX1 in, among other respects, that it specifically spelled out that Shepard would not receive any commission, and deleted the sentence "[b]uyer is purchasing this property in his investment account for a profit."

tions were made, PX4 was executed by Shepard, Inc. and by Linda Cox as Vice President of Kim, Inc. The next day, PX4 was taken to High Point Bank & Trust for signatures acknowledging that the earnest money was in escrow, and the bank was instructed to forward PX4 to the office of Della-Donna in Florida so that Robert Sturrup as Secretary of Kim, Inc. could attest the signature of Linda Cox.

During the telephone call on 18 July 1978 between Shepard, Linda Cox and Robert Sturrup, Shepard inquired about the short form (PX5) used for recording purposes, which was supposed to have been included in the package of documents sent by Della-Donna to Greensboro. Robert Sturrup agreed promptly to mail PX5 to Shepard and did so. On 20 July 1978 Shepard received PX5. Shortly thereafter, Robert Sturrup telephoned Shepard and asked him not to record PX5 because there was a problem with Richardson Corporation's commission. Shepard indicated that he would not record PX5 unless advised to do so. After receiving advice from other people to record PX5, Shepard did so on 21 July 1978.

After Bryan Clemmons of Richardson Corporation learned about PX4 and discovered that Shepard was not claiming any commission, Clemmons telephoned Della-Donna and told him that Richardson Corporation was claiming its 7% commission as listing broker. Della-Donna told Clemmons that if Kim, Inc. had to pay a full commission the deal would not be closed. By telephone call from Della-Donna to Shepard on 26 July 1978 and by letter from Sturrup to Shepard dated 28 July 1978, Kim, Inc. expressed its concern about Shepard's addition to PX4. It notified Shepard that Kim, Inc. would not attest Linda Cox's signature nor deliver PX4 until the dispute with Richardson Corporation was resolved.

On 20 September 1978, Shepard and Richard Maxwell of Maxwell Associates[4] entered into an agreement whereby Shepard assigned PX4 to Piedmont Holding, Inc. (Piedmont) for $85,000.00. This assignment was conditioned upon Kim, Inc.'s notification to

---

4. Explaining Shepard's connection with Maxwell Associates, Richard Maxwell testified: "Mr. Shepard is a licensed broker in the State of North Carolina, . . . [O]n July 1, 1978, . . . he was an independent employee-contractor working through Maxwell Associates on his listings and sales . . .

. . .

Piedmont of Kim, Inc.'s intent to honor its contract with Shepard, Inc. by 2 October 1978. Sturrup and Della-Donna were notified of this assignment. Richard Maxwell testified that at all times between 20 September 1978 and 2 October 1978 Piedmont was not only prepared and able to pay Shepard, Inc. the sum of $85,000.00 according to the terms of the contract between them, but also that Piedmont was prepared to pay, and would have paid, more than $85,000.00 for the assignment. On 3 October 1978, the required notice of intent to close not having been sent by Kim, Inc., Piedmont notified Shepard, Inc. that it was, therefore, cancelling the assignment between Shepard, Inc. and Piedmont.

*Frazier, Frazier & Mahler, by Harold C. Mahler and Patrick A. Weiner, for defendant appellant.*

*Roberson, Haworth & Reese, by J. Brooks Reitzel, Jr., for plaintiff appellee.*

BECTON, Judge.

I

[1]  We address the pivotal issue in this case at the outset—did Shepard, Inc. prove the existence of a valid and enforceable contract? The evidence when viewed in the light most favorable to Shepard, Inc., establishes a contract, breach of contract, and resulting damages. Consequently, the trial court properly denied Kim, Inc.'s motions for entry of a judgment of dismissal on the merits.

a) Mutual assent or counter offer

To form a valid contract there must be an offer and an acceptance, supported by adequate consideration. Kim, Inc. argues (1) that there was never a "meeting of the minds" between Della-Donna (whom Shepard knew was the ultimate decision-maker) and Shepard as to the inclusion or exclusion of the following sentence: "Buyer is purchasing this property in his investment account for a profit."; and (2) that the sentence in issue constituted a counter-offer by Shepard. The trial court rejected Kim, Inc.'s arguments, and so do we. A manifestation of offer and acceptance

---

[H]e could operate as George E. Shepard, Jr., Inc., outside and separate and apart from Maxwell Associates. He could operate under George E. Shepard, Inc., for his own account. If he were to transact any business for other than his own account, it would have to go through Maxwell Associates."

took place at least on 18 July 1978[5] when Linda Cox, the authorized agent of Kim, Inc., made an offer by signing PX4, and Shepard accepted it by his execution. PX4 contains binding mutual promises of the parties to perform an act in the future in exchange for money, and "is governed by the general rules of law governing the formation of contracts in general." 77 Am. Jur. 2d *Vendor and Purchaser* § 4 (1975). *See also Yeager v. Dobbins*, 252 N.C. 824, 114 S.E. 2d 820 (1960); *Atkinson v. Atkinson*, 225 N.C. 120, 33 S.E. 2d 666 (1945).

To create a counter-offer, a change in the original offer must be material; it must alter the legal relationship of the parties to the contract. *See, e.g., Carver v. Britt*, 241 N.C. 538, 85 S.E. 2d 888 (1955) ("subject to details to be worked out" held to refer not to the acceptance of the offer but to the performance of the contract). We do not consider the sentence in issue in this case to be a material change altering the legal relationship of the parties. It in no way affects Kim, Inc.'s obligation to pay a 7% comission. First, Della-Donna had already included in paragraph eight of PX4 a statement that Shepard, Inc. was purchasing the improvements and that no real estate commission would be due either Shepard or Shepard, Inc. Second, if the commission did not have to be shared with any other broker who negotiated a sale, lease or exchange, then Richardson Corporation was entitled to the full 7%. Specifically, Bryan Clemmons, the listing agent for Richardson Corporation, testified: "[Della-Donna] did say it was his understanding that Shepard was waiving his commission, since he was a broker, and I would only be entitled to 3.5%. I said that has nothing to do with Richardson Corporation's getting 3.5%; they get 7% because they are the listing broker."

The commission was governed by Kim, Inc.'s listing contract with Richardson Corporation which obligated Kim, Inc. to pay 7%

5. Shepard, Inc. makes a compelling argument that an agreement on the essential terms of the sale and lease was reached between Shepard and Della-Donna at the original meeting on 28 June 1978. Shepard, Inc. argues that even though the subordinate terms of the agreement had not been concluded, the agreement was sufficient at law to find a contract. *See Yaggy v. B.V.D. Co.*, 7 N.C. App. 590, 173 S.E. 2d 496 (1970) wherein the court held that an oral agreement to sell contained the essential elements of an enforceable contract, even though the attorneys for the parties could not agree upon subordinate terms. In *Yaggy*, a telegram was sufficient to take the contract out of the statute of frauds.

to Richardson Corporation regardless of who sold the property. *Insurance & Realty, Inc. v. Harmon*, 20 N.C. App. 39, 200 S.E. 2d 443 (1973). What Richardson Corporation did with its 7% depended on whether Richardson Corporation sold the property or whether the property was sold by an outside broker. Bryan Clemmons further testified:

> If the listing broker sells it, he gets the whole 7%. If an outside broker sells it, depending on the situation, he can get anywhere from 10% to 50%.

> There is no rule or resolution adopted by the Board of Realtors, or anything that firmly commits all members to pay a certain commission. It is entirely on an individual basis. *It is usually negotiated after the sale.* It depends on what the selling broker's involvement in the transaction is, as to whether they split 50/50, or whatever.

Della-Donna mistakenly concluded that Shepard's waiver of a commission entitled Kim, Inc. to retain 3.5% of the real estate commission and only obligated Kim, Inc. to pay Richardson Corporation 3.5% as the listing broker. His unilateral mistake was not created by the sentence added by Shepard on 18 July 1978. Because this sentence did not materially change the legal relationship of the parties, it did not constitute a counter-offer by Shepard, Inc.

b) Express and apparent authority

[2]   Even if the sentence were considered material, Linda Cox, by corporate resolution, was authorized to execute the agreement with Shepard, Inc.[6] Further, Linda Cox obtained the express approval of Robert Sturrup, who was Secretary of Kim, Inc., law

---

6. The Corporate Resolution attached to the Contract states: "RESOLVED, that Linda Cox, as Vice President of Kim, Inc., be and she is hereby authorized to execute an Agreement with George E. Shepard, Jr., Inc. concerning the sale of the improvements known as King's Inn Motel, Greensboro, North Carolina, together with the furniture, furnishings, fixtures and equipment therein and providing for a lease of the land upon which the King's Inn Motel is located, which will contain an option to sell."

partner of Della-Donna,[7] and a participant with apparent authority to act for Kim, Inc. Linda Cox was clearly an agent of Kim, Inc., and her acts as an agent in accordance with express authority are binding on Kim, Inc. *Investment Properties v. Allen,* 283 N.C. 277, 196 S.E. 2d 262 (1973).

In addition to Linda Cox's express authority, Kim, Inc. is estopped from denying her authority because it placed her in a position where reasonable persons were justified in assuming she had authority to act. Shepard, Inc. dealt with her in reliance on her authority. 19 Am. Jur. 2d, *Corporations* §1164 (1965) states:

> [A] corporation which, by its voluntary act, places an officer or agent in such a position or situation that persons of ordinary prudence, conversant with business usages and the nature of the particular business, are justified in assuming that [s]he has the authority to perform the act in question and deal with [her] upon that assumption, is estopped as against such persons from denying the officer's or agent's authority.

Thus, Linda Cox possessed both express and apparent authority to bind, and did bind, Kim, Inc.

Kim, Inc. also argues that PX4 is unenforceable because Linda Cox's signature was not attested by the secretary of Kim, Inc. in compliance with G.S. 55-36(a) which reads:

> Notwithstanding anything to the contrary in the bylaws or charter, any deed, mortgage, contract . . . when signed in the ordinary course of business on behalf of a corporation by its president or vice-president *and attested or counter-signed by its secretary or an assistant secretary* . . . shall with respect to the rights of innocent third parties, be as valid as if executed pursuant to authorization from the board of directors. . . . The foregoing shall not apply to parties who had actual knowledge of lack of authority. . . . (Emphasis added.)

G.S. 55-36 protects innocent parties from later assertions by corporations that their contracts were not, in fact, authorized by the

---

7. Although Della-Donna was attorney for Kim, Inc., he was neither a shareholder, director or officer of the Corporation and no Resolution authorized him to take any formal action with regard to PX4. Moreover, Shepard had numerous dealings with Sturrup.

corporation's board of directors. Thus, in contracts between corporations and innocent third parties, the statute suspends the ordinary agency rules requiring proof of authority. Subsection (e) clearly shows the statute's remedial nature stating "nothing in this section shall be deemed to exclude the power of any corporate representatives to bind the corporation pursuant to express, implied, or apparent authority, ratification, estoppel or otherwise." G.S. 55-36(e).

Kim, Inc., relies on *Realty, Inc. v. McLamb*, 21 N.C. App. 482, 204 S.E. 2d 880 (1974) in which this court held that a corporate deed which is not attested by the corporate secretary is void nothing else appearing. "Nothing else appeared" in *McLamb;* the only evidence introduced was the deed itself. More importantly, the *McLamb* court remanded the cause for a determination as to whether the corporation ratified the deed or was estopped to deny its validity, and whether the deed might be construed as a contract to convey. In the case at bar, the authority of Linda Cox and Robert Sturrup to bind Kim, Inc. is shown by express and apparent authority. On the facts of this case neither G.S. 55-56 nor *McLamb* is controlling.

c) Delivery

[3]   Kim, Inc., states its final contention on the validity of the contract thusly: "[T]o be valid, a contract to convey land must be in writing and must be delivered." We again reject Kim, Inc.'s argument. The trial court's finding that PX4 was delivered to Shepard, Inc. for signatures is sufficient. There is no requirement that, once delivered, a document must be retained. (The trial court also found delivery of PX5, the short form.) While delivery may be essential under the laws of conveyance to effect a transfer of title, delivery is not essential for the contract in this case which does not attempt to transfer title. PX4 only contains mutual promises by the parties, and is governed by the ordinary principles of contract law.

In this case a valid and binding contract existed. The legal obligations which the parties' agreement created are clear.

Shepard, Inc. has demonstrated that there was an anticipatory breach[8] of the contract.

## II

Based on thirteen separate exceptions, Kim, Inc. contends the trial court erred in admitting certain testimony into evidence. Kim, Inc. excepted to evidentiary rulings of the trial court and challenged the admitted evidence on the following grounds:

1) Relevancy

   a) Shepard's testimony that Robert Sturrup did not indicate that there were "any additional changes to be made, or anything else to be agreed upon";

   b) Maxwell's reading into evidence the assignment of Shepard's alleged contract rights to Piedmont for $85.000.00;

2) Hearsay

   a) Shepard's testimony that he was told that Linda Cox would execute the agreement;

   b) Shepard's testimony that Linda Cox told him that R. C. Boyce "did not want to go through with the transaction";

3) Best Evidence

   a) Shepard's testimony as to who was authorized to act on behalf of Kim, Inc.;

   b) Shepard's testimony as to the purpose of PX5, the short form;

4) Competency

   a) Shepard's testimoney that Della-Donna indicated to him that they had an agreement.

We find no prejudice in any of the evidentiary rulings. There is competent evidence, not objected to, to support each of the court's findings of fact. Further, most of the objections were prop-

---

8. *Cook v. Lawson*, 3 N.C. App. 104, 164 S.E. 2d 29 (1968), defines an anticipatory breach as, "a breach committed before there is a present duty of performance, and is the outcome of words evincing intention to refuse performance in the future." (Citations omitted.) *Id.* at 107, 164 S.E. 2d at 32.

erly overruled. For example, since PX4 and PX5 were admitted into evidence, Kim, Inc.'s "Best Evidence" objection and "Hearsay" objection (about who would execute the agreement) are meritless. Moreover,

> [i]n a trial before the judge, sitting without a jury, "the ordinary rules as to the competency of evidence applied in a trial before a jury are to some extent relaxed, for the reason that the judge with knowledge of the law is able to eliminate from the testimony he hears that which is immaterial and incompetent, and consider that only which tends properly to prove the facts to be found." There is a presumption that if incompetent evidence was admitted, it was disregarded and did not influence the judge's findings; but the presumption is rebuttable, and "it would be reviewable error for the judge, exercising at the same time his own and the functions of a jury, to admit and act upon incompetent evidence in finding facts."

It would be difficult to rebut the presumption in favor of proper action except in cases where the only evidence to support the finding was incompetent, or where the judge by words or conduct indicated his intention to consider the incompetent evidence. Stansbury, N.C. Evidence 2d §4a (Brandis revision 1973).

### III

Citing numerous exceptions, Kim, Inc. argues that there was insufficient evidence to support the court's Findings of Fact and Conclusions of Law. Shepard, Inc.'s meticulous and detailed eleven-page response, our review of the entire record, and the applicable standard set forth below impel a conclusion that the court did not err in its Findings of Fact and its Conclusions of Law. The applicable standards can be summarized thusly:

1. The trial court's findings of fact in a non-jury trial have the force and effect of a verdict by a jury and are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary. *Williams v. Insurance Co.*, 288 N.C. 338, 218 S.E. 2d 368 (1975).

2. When there is sufficient competent evidence to support a finding of fact by the court, it will be presumed that the court

disregarded incompetent evidence tending to support the same finding, unless the record affirmatively discloses that the finding was based, in part at least, on incompetent evidence heard over objection.

3. When the findings supported by competent evidence are sufficient to support the judgment, the judgment will not be disturbed because (a) another finding, which does not affect the conclusion, is not supported by evidence; (b) the court made an additional finding which is immaterial to the case; (c) the court admitted evidence relating to an immaterial finding; or (d) the court refused to make additional, immaterial findings. *See Industries, Inc. v. Construction Co.,* 29 N.C. App. 270, 224 S.E. 2d 266, *disc. rev. denied,* 290 N.C. 551, 226 S.E. 2d 509 (1976).

We conclude that the court's Findings of Fact and Conclusions of Law are supported by competent, relevant and probative evidence.

## IV

[4]  Kim, Inc.'s final argument is that there was no competent evidence of the fair market value of the property involved. Damages for the breach of a contract involving real estate are cogently expressed in *Johnson v. Insurance Co.,* 219 N.C. 445, 14 S.E. 2d 405 (1941):

> [T]he damages recoverable for breach of contract by the vendor to convey real estate are only such as may fairly and reasonably be well considered as arising naturally . . . from such breach, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as a probable result of the breach. The loss of the vendee's bargain is assessed upon the basic either of the difference between the contract price and the actual value of the land, or the actual value of the land less the amount, if any, remaining unpaid on the contract price.

*Id.* at 449-50, 14 S.E. 2d at 407.

Shepard, Inc. established that assignment of the contract was within the contemplation of the parties. Consequently, the assignment to Piedmont was clearly foreseeable. Further, the best evidence of the loss of bargain caused by the failure of Kim, Inc. to perform under the contract is the free, armslength bargain to assign the contract to Piedmont. There is no evidence of collusion between Shepard, Inc. and Piedmont. This bargain was made

when neither party was compelled to buy or sell. Shepard's testimony of other serious negotiations ("As of September 20, 1978, there were several possible purchases I was still working with.") and Richard Maxwell's testimony of alternative plans (condominiums or a medical clinic), show that conditions were ripe for establishing fair market value of the property. Richard Maxwell's testimony is compelling.

I knew from the outset in mid-July, 1978, that there was a slight problem between Mr. Shepard and Kim, Inc. over the property. Although that problem apparently hadn't gone away by September 20, 1978, there was every reason to believe that it would go away. . . . I was prepared, as of September 20, 1978, to pay him more money than I offered.

On September 20, 1978, I was simply intending to purchase that piece of property, to develop it as a medical clinic. [It was already zoned for a medical clinic.]

. . .

I looked at several alternatives. . . . I looked at it with one group owning the land; individual groups owning the condominiums on that piece of property. . . . I looked at the entire project, either keeping the existing buildings and remodeling them, or tearing down every building. I had, at that time, negotiated a contract to tear all the buildings down.

. . .

I knew I was prepared to pay Mr. Shepard more money, and I knew that when he signed that I had already made money. I believe that my investors were aware of the figures in my proposal to Mr. Shepard. . . . [T]he investors rely on me to come up with the package; then they will invest in me.

. . .

I considered handling this investment project myself. I could have financially handled it myself without partnership. I was prepared to close the transaction on my own.

Kim, Inc. also maintains that Shepard, Inc. could have mitigated its damages by paying $15,750, the disputed 3.5% commission to Kim, Inc., and closing under protest. The law does not require that Shepard, Inc. incur undue risk, expense or humiliation in order to mitigate damages, 11 Williston, *Contracts,* § 1353 (1957).

Shepard, Inc. demonstrated by competent evidence that a contract had been formed, that there was an anticipatory breach of the contract, and that the natural and proximate damages were $85,000.00. We find no error in the trial court's evidentiary rulings and conclude that the trial court correctly denied Kim, Inc.'s motion for dismissal. Accordingly, we

Affirm.

Judge MARTIN (Robert M.) and Judge WHICHARD concur.