AMERICAN CLIPPER CORPORATION v. WALTER SCOTT HOWERTON AND
FINANCEAMERICA CORPORATION

No. 119A81

(Filed 5 June 1984)

1. **Automobiles and Other Vehicles § 5— retaining manufacturer's statements of origin after transferring vehicle for sale—violation of statute**

    G.S. 20-52.1(a) was not designed to provide a method for manufacturers of vehicles to protect themselves against their dealers' defaults by withholding the manufacturer's statement of origin on vehicles transferred to dealers for ultimate sale to consumers, and the manufacturer of a recreational vehicle violated the statute by retaining the manufacturer's statements of origin when it transferred the vehicle to a dealer for sale by the dealer.

2. **Automobiles and Other Vehicles § 5; Uniform Commercial Code § 1— superior title or security interest of manufacturer of vehicle or lender—applicability of Uniform Commercial Code**

    Provisions of the Uniform Commercial Code rather than the title transfer provisions of the Motor Vehicle Act governed the issue of whether the manufacturer of a recreational vehicle or the lender which financed the purchase of the vehicle from a dealer had the superior title or security interest in the vehicle after the dealer failed to process the purchaser's title and to pay the manufacturer for the vehicle.

3. **Uniform Commercial Code § 16— transaction between manufacturer of vehicle and dealer as consignment—protection of consignor's interest**

    A transaction between a manufacturer of a recreational vehicle and its dealer was a consignment where possession of the vehicle was delivered to the dealer for the purpose of a future sale by the dealer which would be contemporaneous with a sale between the manufacturer and the dealer, the manufacturer was entitled to reclaim physical possession of the vehicle at any time before the dealer's acceptance of an offer to purchase, and the dealer had the option to return the vehicle to the manufacturer at any time. Therefore, the provisions of G.S. 25-2-326(3) governed what the manufacturer had to do to protect its interest as consignor.

4. **Uniform Commercial Code § 16— manufacturer's entrustment of vehicle to dealer—loss of title—superior interest of lender**

    Even if the manufacturer of a consigned recreational vehicle retained title by retaining the manufacturer's statements of origin, it ultimately lost title under the law of entrustment set forth in G.S. 25-2-403(2) where it entrusted the vehicle to a merchant dealing in goods of that kind, followed by a sale by that merchant to a buyer in the ordinary course of business. Once a sale was made by the entrustee to such buyer, title passed from the entrustor to the buyer, the buyer could assign title in the vehicle as he wished, and the buyer's assignment of a security interest to the consignee by an installment sale contract and the consignee's assignment of its interest in the installment sale con-

American Clipper Corp. v. Howerton

tract to the lender who financed the purchase gave the lender an interest or "title" in the vehicle superior to that of the manufacturer.

**5. Uniform Commercial Code § 39— consigned recreational vehicle—manufacturer's retention of statements of origin—perfection of security interest**

The manufacturer did not preserve its title in a consigned recreational vehicle by keeping the manufacturer's statements of origin but at most reserved a security interest in the vehicle, G.S. 25-2-41(1), and where the manufacturer maintained the vehicle in its own inventory and intended the consignment as security, the manufacturer was required to comply with the provisions of Art. 9 of the Uniform Commercial Code in order to protect its security interest.

**6. Uniform Commercial Code § 43— recreational vehicle—failure of manufacturer to perfect security interest—superior right of assignee of installment sale contract**

Where the manufacturer of a consigned recreational vehicle took no action to protect its security interest under Art. 9 of the Uniform Commercial Code, a lender which gave new value in purchasing the installment sale contract from the consignee and took possession of it in the ordinary course of its business had a superior security interest in the installment sale contract under G.S. 25-9-308.

**7. Uniform Commercial Code § 43— recreational vehicle—manufacturer's failure to perfect security interest—superior right of assignee of installment sale contract**

Even if the manufacturer of a consigned recreational vehicle preserved a security interest in an installment sale contract of the vehicle by its retention of the manufacturer's statements of origin, and even if the assignee of the installment sale contract could be charged with knowledge that the manufacturer so preserved a security interest, the manufacturer could not defeat the assignee's priority under the provisions of G.S. 25-9-308(a) because the manufacturer's security interest was not perfected under G.S. 25-9-304 or 25-9-306. Nor could the manufacturer defeat the assignee's priority under G.S. 25-9-308(b) because the manufacturer's security interest in the installment sales contract, if any, could be claimed "merely as proceeds of its inventory," the recreational vehicle.

**8. Corporations § 25— corporation's assignment of installment sale contract—absence of attestation by secretary**

A corporate assignor was bound by its assignment of an installment sale contract even though it was signed only by the corporation's president and was not attested or countersigned by the corporation's secretary or assistant secretary where the corporation, pursuant to its course of dealing with the assignee, had clothed its corporate president with apparent authority to execute assignments like the one in issue.

Justices MITCHELL, MARTIN and FRYE took no part in the consideration or decision of this case.

ON defendant's petition to review the decision of the Court of Appeals, opinion by *Judge Becton*, with then *Chief Judge Morris* (now retired) and *Judge Vaughn* (later Chief Judge) concurring, reported at 51 N.C. App. 539, 277 S.E. 2d 136 (1981), affirming summary judgment entered by the late *Judge Riddle* in GUILFORD Superior Court in favor of plaintiff, American Clipper Corporation.

*Turner, Enochs & Sparrow, P.A., by Wendell H. Ott and Thomas E. Cone, for plaintiff appellee, American Clipper Corporation.*

*Pearman & Pearman by Richard M. Pearman, Jr., for defendant appellant, FinanceAmerica Corporation.*

EXUM, Justice.

This case was brought as a declaratory judgment action to determine which party has superior title or security interest in a particular recreational vehicle. On stipulated facts and a "Partial Settlement Agreement," Judge Riddle, presiding at the 6 June 1980 Session of Guilford County Superior Court, entered summary judgment for plaintiff American Clipper Corporation (hereinafter Clipper). The Court of Appeals affirmed.

The basis for the Court of Appeals' decision was its conclusion that the provisions of the Motor Vehicle Act (MVA), specifically section 20-52.1, governed the case and took precedence over relevant provisions of the Uniform Commercial Code (UCC), as codified in Chapter 25 of the North Carolina General Statutes.[1] We disagree and reverse.

I.

The parties stipulated to the following facts:

Clipper manufactured a recreational vehicle using a chassis, transmission, and motor obtained from Chrysler Corporation. Clipper shipped the completed vehicle, along with Chrysler's manufacturer's statement of origin (MSO), and its own supplemental MSO, to one of its dealers in Maryland. The Maryland dealer

---

1. Sections of the UCC and the Motor Vehicle Act will be cited herein only by reference to the section number without the notation "N.C. Gen. Stat."

denied ordering the vehicle and refused delivery, whereupon Clipper shipped the vehicle to a North Carolina dealership with whom it had a prior course of business, Adventure America, Inc. (hereinafter Adventure). Adventure received the vehicle, along with instructional material, an owner's manual, and Clipper and Chrysler warranty forms, on 10 October 1978. Also accompanying the vehicle was a document revealing a purchase price of $15,076 and a statement that "[t]his is not a [sic] invoice . . . ." The original MSO was destroyed after the Maryland dealer's refusal of delivery. Clipper requested and received a duplicate MSO from Chrysler. Clipper retained possession of both the Chrysler MSO and its own MSO.

Clipper was willing to sell the vehicle at the specified price to Adventure, at Adventure's option. No money changed hands. Per oral agreement, Clipper was entitled to reclaim possession of the vehicle any time before Adventure's acceptance of Clipper's offer to sell at the specified price. Clipper authorized Adventure to demonstrate the vehicle to prospective customers. Clipper characterized the transaction with Adventure as a consignment and kept the vehicle on its own inventory list. From October 1978 until June 1979 Clipper periodically contacted Adventure, which assured Clipper that the vehicle was still on Adventure's lot. No sign was posted on the vehicle identifying Clipper as owner or consignor. Clipper and Adventure did not enter into a written security agreement concerning the vehicle. No financing statement was filed. Clipper and Adventure had an "informal understanding" that Adventure would secure a purchaser at a price to be determined by Adventure at which time Adventure would purchase the vehicle from Clipper.

On 12 April 1979, Adventure entered into a "Consumer Credit Installment Sale Contract" (hereinafter "installment sale contract") with defendant Walter S. Howerton for the purchase of the vehicle at a price of $20,799. After a down payment and credit for a trade-in, Howerton's balance was $15,500. Howerton was a "buyer in the ordinary course of business," as this phrase is defined by the UCC.

Defendant FinanceAmerica, Inc. (hereinafter Finance) at that time had had a regular business relationship and course of dealing with Adventure in which Finance provided retail financing for

vehicles sold by Adventure. In this case, as it had done regularly, Adventure used the credit application form and installment sale contract form provided by Finance. Adventure supervised execution of these forms and delivered the executed forms to Finance. As delivered, the installment sale contract form included a "Non-Recourse Assignment and Warranty" paragraph signed by Adventure's president which recited the assignment of Adventure's rights in the vehicle and the contract to Finance. Upon Finance's approval of Howerton's credit and the installment sale, Finance disbursed $15,500 directly to Adventure, and Adventure immediately delivered the vehicle to Howerton. Howerton completed an application for a certificate of title and obtained from Adventure a twenty-day temporary registration for the vehicle, both on forms supplied by Adventure. Based upon their established course of dealing, Finance relied upon Adventure to process Howerton's application for title certification, to furnish the applicable MSOs and to insure that Finance's lien was recorded on the title certificate. Finance never requested an MSO from Adventure nor determined whether Adventure possessed it. Adventure never processed Howerton's title application. Adventure did not pay Clipper for the vehicle. In June 1979, Clipper first learned that the vehicle was gone from Adventure's lot and thereafter brought this action.

Before Clipper filed its complaint on 10 July 1979, the parties entered into a "Partial Settlement Agreement." By the terms of this agreement: Clipper dismissed all claims against Howerton and delivered to Finance both its and Chrysler's MSO. Howerton agreed to execute any necessary documents for Finance's application to the Division of Motor Vehicles for a title certificate in Howerton's name on which would be noted a lien in favor of Finance pursuant to the installment sale contract executed on 12 April 1979 by Adventure and Howerton. Howerton acknowledged the assignment of this installment sale contract by Adventure to Finance and released all claims he might have had arising out of the invalidity, if any, of this assignment or the invalidity, if any, of Finance's security interest. Howerton agreed to pay to Finance the obligations created by this contract in accordance with its terms. The parties agreed that the declaratory judgment action should be determined solely on the basis of the stipulated facts "without regard to any changes in the status of the parties

brought about by the execution or performance of this [partial settlement] agreement." Finally, the agreement provided:

> All parties agree that if Clipper shall obtain a favorable final judgment in the declaratory judgment action referred to above, holding that its right to ownership, title, possession or a security interest with respect to said vehicle is superior to that of either Howerton or Finance, it will receive and accept from Finance the sum of Fifteen Thousand Seventy-Six dollars ($15,076) plus interest at the rate of eight percent (8%) per annum from June 7, 1979, to the date of payment of said sum, in lieu of reclaiming possession of and/or title to said vehicle and in lieu of any other damages to which it may be entitled.

## II.

We must decide whether Clipper or Finance shall bear the loss resulting from Adventure's failure to pay Clipper for the vehicle, as it had agreed to do, after selling the vehicle to Howerton. Either Clipper or Finance will have an uncompensated investment in the transaction because of Adventure's default. The question as the parties have put it is whether Clipper has a "right to ownership, title, possession or a security interest with respect to said vehicle superior to that of either Howerton or Finance." We hold that Clipper does not.

Section 20-52.1, a provision of the MVA, provides:

> (a) Any manufacturer transferring a new motor vehicle to another shall, at the time of the transfer, supply the transferee with a manufacturer's certificate of origin assigned to the transferee.

> (b) Any dealer transferring a new vehicle to another dealer shall, at the time of transfer, give such transferee the proper manufacturer's certificate assigned to the transferee.

> (c) Upon sale of a new vehicle by a dealer to a consumer-purchaser, the dealer shall execute in the presence of a person authorized to administer oaths an assignment of the manufacturer's certificate of origin for the vehicle, including in such assignment the name and address of the transferee and no title to a new motor vehicle acquired by a dealer

under the provisions of subsections (a) and (b) of this section shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee.

Any dealer transferring title to, or an interest in, a new vehicle shall deliver the manufacturer's certificate of origin duly assigned in accordance with the foregoing provision to the transferee at the time of delivering the vehicle, except that when a security interest is obtained in the motor vehicle from the transferee in payment of the purchase price or otherwise, the transferor shall deliver the manufacturer's certificate of origin to the lienholder and the lienholder shall forthwith forward the manufacturer's certificate of origin together with the transferee's application for certificate of title and necessary fees to the Division. Any person who delivers or accepts a manufacturer's certificate of origin assigned in blank shall be guilty of a misdemeanor.

The Court of Appeals, having determined that this statute controlled the case, concluded as follows:

In all respects, the transactions involving the vehicle were conducted in violation of G.S. 20-52.1. Under the statute, record title to the new vehicle cannot 'pass or vest' until the MSO is properly assigned. Hence, record, paper title remained in the name of Clipper.

Although G.S. 25-2-401 provides that the provisions of the UCC apply to the rights and liabilities of parties to a sales transaction 'irrespective of title to the goods,' the motor vehicle certificate of title statutes, including G.S. 20-52.1, still have vitality and are not implicitly replaced by the adoption of the UCC. *See* Anderson, *Uniform Commercial Code, 'Motor Vehicles.'* § 2-401:9 (1971); *Insurance Co. v. Hayes*, 276 N.C. 620, 174 S.E. 2d 511 (1970).

Pursuant to G.S. 20-52.1 then, Clipper was record title holder to the recreational vehicle in the possession of Howerton. According to the record, Finance never filed or perfected its security interest in the vehicle. If Finance had taken the steps necessary to file or perfect its security interest, it would have discovered that Adventure did not have record title to the vehicle, nor did Howerton. In allocating the risk of

loss between Clipper and Finance, Finance was in the best position to prevent the title confusion which ensued. Finance incurred the risk of loss when it loaned money on collateral without first determining whether its assignor, Adventure, or its debtor, Howerton, had record title to the vehicle. Clipper did the most that it could as a manufacturer; it held onto its MSO and awaited acceptance by Adventure of its offer to sell the vehicle in question. As between Clipper and Finance, then, the trial judge properly found that Clipper held title to the vehicle superior to the rights and title held by Finance. Finance, therefore, should bear the risk of loss accompanying the sale and financing of this vehicle.

It should be noted that this case in no way decides the right to ownership, title and possession of the vehicle as between the manufacturer, Clipper, and the consumer, Howerton. Even if Howerton were found to have superior title to Clipper, under the facts and agreements of this case, Clipper would still have title superior to Finance and would prevail against Finance.

Based on the stipulated facts and Partial Settlement Agreement entered into by the parties, we find that the trial judge acted properly in granting Clipper's motion for summary judgment.

[1] Except for the statement that "in all respects, the transactions involving the vehicle were conducted in violation of G.S. 20-52.1," we disagree with the Court of Appeals' conclusions. Probably Clipper retained the MSOs in an attempt to secure itself against loss of the vehicle through possible default by Adventure. Nevertheless, in retaining the MSOs while at the same time transferring the vehicle to Adventure for sale by Adventure, Clipper itself violated section 20-52.1(a). This statute is not permissive. It *requires* a manufacturer, like Clipper, "transferring a new motor vehicle to another" both to supply and to assign the MSO, which the statute denominates a "certificate of origin," to the transferee "at the time of the transfer."

When a manufacturer transfers a new motor vehicle to another he is required, at the time of transfer, to supply the transferee with a manufacturer's certificate of origin assigned to the transferee. G.S. 20-52.1(a). Any dealer who

transfers a new vehicle to a consumer-purchaser is required, at the time of transfer, to give the purchaser the proper manufacturer's certificate assigned to the transferee. G.S. 20-52.1(c).

*King Homes, Inc. v. Bryson*, 273 N.C. 84, 90-91, 159 S.E. 2d 329, 331 (1968). Our statutes dealing with the transfer of motor vehicles "are not mere directory rules incidental to the sale and transfer of motor vehicles, to be observed, to be circumvented, or to be disregarded at the will or pleasure of the seller or purchaser of a motor vehicle." *Hawkins v. M & J Finance Corp.*, 238 N.C. 174, 182, 77 S.E. 2d 669, 676 (1953). The statute was not designed to provide a method for manufacturers to protect themselves against their dealers' defaults by withholding MSOs on vehicles transferred to dealers for ultimate sale to consumers. Indeed, either Adventure, Howerton, or Finance at any time after Clipper transferred the vehicle to Adventure could have compelled Clipper to comply with subsection (a) of the statute by supplying the MSOs to Adventure so that they in turn could comply with subsection (c).

The statute was designed, for the protection of the public generally, to regulate the transfer of new motor vehicles from manufacturers to dealers and, ultimately, to consumers. This particular statute provides a method whereby consumers can be assured they are purchasing newly manufactured vehicles. The statute is one segment of an entire statutory scheme of "police regulations designed and intended to provide a simple expeditious mode of tracing titles to motor vehicles so as to (1) facilitate the enforcement of our highway safety statutes, (2) minimize the hazards of theft, and (3) provide safeguards against fraud, imposition, and sharp practices in connection with the sale and transfer of motor vehicles." *Hawkins*, 238 N.C. at 182, 77 S.E. 2d at 676.

*Hawkins* is instructive. Hawkins, plaintiff, owned a Plymouth car and a Chevrolet truck which he delivered to one Thorne, a used car dealer, under an agreement whereby he authorized Thorne to sell the vehicles for him. Hawkins also delivered to Thorne the certificates of title for the vehicles on which Hawkins had endorsed in blank assignment forms on the reverse side of the certificates. Instead of selling the vehicles, Thorne used them as collateral to secure loans from defendant Finance Corp. The

finance company took possession of the Plymouth automobile and both certificates of title. Hawkins obtained possession of the Chevrolet truck from Thorne and brought an action in claim and delivery against Finance Corp. for the Plymouth and the certificates of title. This Court analyzed the question whether Hawkins or Finance Corp. had superior title to the vehicles, not in terms of the title transfer provisions of the MVA, but in terms of the general law of sales, bailment, and entrustment prevailing at the time. On the question of whether Hawkins was estopped to assert title to the vehicles because he delivered the certificates of title endorsed in blank to Thorne, the Court concluded that he was not on the ground that the endorsements of the assignments were not in compliance with the MVA.

*King Homes* is also instructive. In that case plaintiff, the manufacturer of a mobile home, brought action for claim and delivery of the mobile home against defendant Bryson who had purchased the home from one of plaintiff's dealers. The plaintiff manufacturer's evidence tended to show the following: Plaintiff arranged with its dealer, Twentieth Century Mobile Homes, Inc., for the dealer to purchase the mobile home for cash. Plaintiff delivered the mobile home to Twentieth Century and received Twentieth Century's check for the price of the mobile home upon delivery. Twentieth Century's check was returned for insufficient funds. Meanwhile, Twentieth Century sold the mobile home to defendant Bryson who paid Twentieth Century cash. Plaintiff's vice president gave contradictory testimony with reference to whether the MSO accompanied the mobile home when it was delivered to Twentieth Century. At one point the vice president said the MSO accompanied the mobile unit. At another point he testified that he retained possession of the MSO.

At the close of plaintiff's evidence the trial court allowed defendant's motion for nonsuit. This Court reversed. In analyzing the question whether plaintiff manufacturer or defendant Bryson had superior title to the mobile home, this Court, as it had done in *Hawkins*, looked to the general law of sales, bailment, and entrustment prevailing at the time. Based on those principles of law, the Court concluded that the evidence in the light most favorable to the plaintiff was sufficient to permit a jury to find that title to the mobile home remained in the plaintiff "and never passed to Twentieth Century because its check was dishonored

by the bank upon which it was drawn." 273 N.C. at 90-91, 159 S.E. 2d at 333. The Court held further that since the evidence when considered most favorably to the manufacturer failed to show that it had invested Twentieth Century with the MSO "or any other indicia of title upon which defendant relied, plaintiff is not estopped . . . from asserting its title even against an innocent purchaser." *Id.* at 91, 159 S.E. 2d at 333.

In *Nationwide Mutual Insurance Co. v. Hayes*, 276 N.C. 620, 174 S.E. 2d 511 (1970), the question was which of two automobile liability insurance policies, one a "nonowner" policy, and the other an "owner" policy, provided coverage for a particular automobile accident. The Court concluded that the question must be determined by fixing the date on which the insured acquired title to the vehicle in question. To resolve this question the Court looked to the title transfer provisions of the MVA, specifically section 20-72, rather than the UCC. All parties to the transfer of the automobile complied with section 20-72. The Court noted that the UCC abandoned "the concept of title as a tool for resolving sales problems," *id.* at 632, 174 S.E. 2d at 518, and held that title to the motor vehicle in question passed when the title transfer requirements of the MVA were complied with and not when the vehicle was delivered. *Hayes* dealt with a situation in which the rights of parties not privy to the sales transaction itself, hinged on the time when legal title to the vehicle passed. For such a determination *Hayes* correctly looked to the title transfer provisions of the MVA which it characterized as "public regulations" rather than the UCC which it characterized as "a private law," *id.* at 639, 174 S.E. 2d at 523. The Court in *Hayes* said, more fully:

> The Uniform Commercial Code, in general, covers transactions in personal property and is particularly related to negotiable instruments, bills of lading and sales in general. The Motor Vehicles Act is concerned only with the automobile and although the word 'automobile' comes within the general term of 'goods,' automobiles are a special class of goods which have long been heavily regulated by public regulatory acts. In this connection, the official comment to section 25-2-401 seems to say that the Uniform Commercial Code makes no attempt to set a specific line of interpretation where a public regulation is involved, but that in case a court should decide to apply this private law definition and reason-

ing to its public regulation, that there should be a clear and concise definitional basis for so doing. Such comment leads to the conclusion that the sales act, a private law, is not necessarily applicable to public regulations unless the court chooses to make it so.

*Id.* at 638-39, 174 S.E. 2d at 523. Thus *Hayes* left open the question whether the MVA, as opposed to the UCC, would control in all circumstances.

In deciding the kind of question here presented, albeit in terms of which party had "title," this Court in both *Hawkins* and *King Homes, Inc.* looked to the general law of sales, bailment and entrustment prevailing at the time of the transactions then in question. It did not rely on the title transfer provisions of the MVA except to help resolve the question whether the party who otherwise had title was estopped to deny it. Because of the nature of the then prevailing general law of sales, bailment and entrustment, the Court in *Hawkins* concluded that the original owner of the vehicles had title; and in *King Homes, Inc.* the Court concluded the jury could find title to be in the manufacturer of the mobile home. But, as we noted in *Nasco Equipment Co. v. Mason,* 291 N.C. 145, 153, 229 S.E. 2d 278, 283-84 (1976):

It seems likely that plaintiff has mistakenly relied on the traditional North Carolina rule that the mere entrustment to a bailee by an owner of a chattel would not preclude the owner from recovering possession as against the mortgagee of the bailee since the bailee had no title and the mortgagee did not occupy the position of a *bona fide* purchaser. The exception to this rule lay in circumstances where the owner clothed the mortgagor with the indicia of ownership. *Wilson v. Finance Co.,* 239 N.C. 349, 79 S.E. 2d 908 (1954). Plaintiff, in essence, is relying on our traditional concepts of title in order to resolve what is essentially a security interest problem, the answer to which must be found in the Uniform Commercial Code. The Code has significantly modified our traditional rules in this area. 'The most basic departure from previous law which is found in the Uniform Commercial Code is the abandonment of the concept of title as a tool for resolving sales problems.' *Insurance Co. v. Hayes,* 276 N.C. 620, 632, 174 S.E. 2d 511, 518 (1970).

[2]   We conclude, therefore, that the provisions of the UCC and not the MVA properly resolve the contest here. As the Court tacitly recognized in both *Hawkins* and *King Homes, Inc.*, the title transfer provisions of the MVA were not designed to resolve the kind of question here presented. The UCC, which generally has supplanted the principles relied on in *Hawkins* and *King Homes, Inc.*, was so designed and should have been, but was not, employed by Clipper in this case. For similar holdings from other jurisdictions, see *Wood Chevrolet Company, Inc. v. Bank of the Southeast*, 352 So. 2d 1350 (Ma. 1977); *Cunningham v. Camelot Motors, Inc.*, 138 N.J. Super. 489, 351 A. 2d 402 (1975); *Bank of Beulah v. Chase*, 231 N.W. 2d 738 (N.D. 1975). We now proceed to apply the pertinent provisions of the UCC to the transactions before us.

### III.

[3]   We agree with Clipper that the transaction between Clipper and Adventure was not a sale of the vehicle. Although Clipper put the vehicle in the possession of Adventure, its dealer, so that Adventure could sell it, the transaction was not a "sale or return" within the meaning of section 25-2-326(1)(b), because Clipper did not sell the vehicle to Adventure. The goods were not delivered for "resale," as required by section 25-2-326(1)(b), but for the purpose of a future sale by Adventure which would be contemporaneous with a sale between Clipper and Adventure. *Stewart v. Brown*, 546 S.W. 2d 204, 206 (Mo. App. 1977).

The transaction between Clipper and Adventure most nearly resembles a consignment. At least before the consignee sells the goods, "[t]he hallmark of the consignment . . . is the absence of an absolute obligation on the part of the consignee to pay for the goods." *Nasco Equipment Co.*, 291 N.C. at 153, 229 S.E. 2d at 284 (1976) (quoting Hawkland, "Consignment Selling Under the Uniform Commercial Code," 67 Com. L.J. 146, 147 (1962) ). Clipper was entitled to reclaim physical possession of the vehicle at any time before Adventure's acceptance of the offer to sell. Adventure had the option to return the vehicle to Clipper at any time. It is apparent that Adventure had no "absolute obligation to pay" Clipper.

Because we characterize Clipper's transaction with Adventure as a consignment, the provisions of section 25-2-326(3) are applicable:

> If the consignment were intended as security, the consignor must comply with the filing requirements of Article 9 to prevail. G.S. 25-1-201(37). . . . If the consignment is not for security, reservation of title is not a security interest, but the consignor must nevertheless comply with the requirements of General Statute 25-2-326 in order to defeat any creditor of the consignee.

*Id.* at 154, 229 S.E. 2d at 284.

Section 25-2-326(3) then sets out what a consignor must do to prevail against a creditor of a consignee:

> (3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum.' However, this subsection is not applicable if the person making delivery

> (a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

> (b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

> (c) complies with the filing provisions of the article on secured transactions (article 9).

The parties have stipulated that "while the said vehicle was on Adventure's lot, no signs were posted on the vehicle or elsewhere identifying Clipper as the owner or consignee." There is no indication that Adventure was "generally known by [its] creditors to be substantially engaged in selling goods of others." Clipper made no

attempt to file a financing statement. In short, Clipper did nothing to protect its interest as consignor. *Id.*

[4] Even if Clipper initially retained title to the consigned vehicle by retaining the MSOs, it ultimately lost title under the provisions of section 25-2-403(2), which sets forth the law concerning entrustment. Clipper's giving possession of the vehicle to Adventure was an entrustment of the vehicle. "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." § 25-2-403(2). Three essential elements must be present to make this statute operative: (1) an entrustment of goods to (2) a merchant dealing in goods of that kind, followed by a sale by that merchant to (3) a buyer in the ordinary course of business. *Toyomenka, Inc. v. Mount Hope Finishing Co.*, 432 F. 2d 722, 727 (4th Cir. 1970).

That Adventure was a merchant dealing in recreational vehicles is evidenced by its maintenance of a lot for the display of such vehicles as well as by its prior course of dealing with Clipper. A "buyer in the ordinary course of business" is "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . . ." § 25-1-201(9). The parties have stipulated that Howerton meets this definition.

If all the essential elements of section 25-2-403(2) are satisfied, the entrustee, here Adventure, had the power, under the statute, to transfer such title as the entruster possessed. *Christopher v. McGehee*, 228 Ga. 466, 186 S.E. 2d 97 (1971); 3 Anderson, Uniform Commercial Code § 2-403:54 at 598-99 (3d ed. 1983). Since the elements of the statute were satisfied, Clipper's title was transferred by Adventure, the entrustee, to Howerton, under the provisions of section 25-2-403(2).

Clipper points out, however, that it prevails under the partial settlement agreement if it has title superior to either Howerton *or* Finance. In this respect, the Court of Appeals held that, "Even if Howerton were found to have superior title to Clipper, under the facts and agreements of this case, Clipper would still have title superior to Finance and would prevail against Finance." 51 N.C. App. at 545, 277 S.E. 2d at 139. We disagree.

The sale by the entrustee makes a definitive transfer of the entruster's title. Hence, not only the immediate buyer from the entrustee but all successive transferees of the goods hold the title of the entruster. That is, once a buyer acquires title by virtue of UCC § 2-403, subsequent purchasers from him benefit by his title without regard to whether they themselves would qualify as buyers in ordinary course of business.

3 Anderson, *supra*, § 2-403:59 at 600-01. Once, therefore, a sale has been made by the entrustee to a buyer in ordinary course of business, title passes from the entruster to the buyer. The entruster no longer has title. The buyer then has the power to transfer to another the interest he received in the goods. Clipper's title to the vehicle passed to Howerton upon Adventure's sale of the vehicle to Howerton. Clipper no longer had title to the vehicle after Adventure's sale. Howerton could assign title in the vehicle as he wished and did assign by the installment sale contract a security interest in the vehicle to Adventure. Finance, as assignee of Adventure's interest in the installment sale contract executed by Howerton, had an interest, or "title," in the vehicle superior to Clipper's. Clipper had no title at all.

[5] Title, however, was not preserved in Clipper by its keeping of the Chrysler MSO and its own supplemental MSO. "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." § 25-2-401(1). *See also* § 25-1-201(37). At most Clipper's retention of the documents reserved a security interest. *Nasco Equipment Co.*, 291 N.C. at 155, 229 S.E. 2d at 285; *Toyomenka*, 432 F. 2d at 728. Clipper's security interest, if any, is not one of those governed by section 20-58.1, *et seq.*

The provisions of G.S. 20-58 through 20-58.8 inclusive shall *not* apply to or affect: . . . (3) A security interest in a vehicle created by a manufacturer . . . who holds the vehicle in his inventory. Such security interests shall be perfected by filing a financing statement under Article 9 of the Uniform Commercial Code.

§ 20-58.8(b) (emphasis added). The parties have stipulated that Clipper maintained the vehicle on its own inventory after shipment of the vehicle to Adventure. Therefore, Clipper's perfection

of its security interest in the recreational vehicle was governed by Article 9 of the UCC. Additionally, when a consignment is functionally equivalent to a floor plan finance situation, as here, the transaction is treated as one for security and the consignor is required to comply with the provisions of Article 9. *See* J. White & R. Summers, Uniform Commercial Code § 22-4 at 887 (2d ed. 1980). We find that Clipper intended the consignment as security and therefore cannot prevail over Finance since it took no action to protect its security interest under Article 9.

[6] Under the provisions of section 25-9-308 Finance has a superior security interest in the installment sales contract, the chattel paper. Section 25-9-105(1)(b) defines chattel paper as "a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods . . . ." The Court of Appeals' description of Finance's activity as loaning money on collateral is not wholly correct. Finance also purchased chattel paper when it disbursed $15,500 to Adventure in return for the assignment of the Howerton installment sale contract, a writing within the meaning of section 25-9-105(1)(b). Finance gave new value for the installment sale contract and took possession of it in the ordinary course of its business.

> A purchaser of chattel paper or an instrument who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest in the chattel paper or instrument
>
> (a) which is perfected under G.S. 25-9-304 (permissive filing and temporary perfection) or under G.S. 25-9-306 (perfection as to proceeds) if he acts without knowledge that the specific paper or instrument is subject to a security interest; or
>
> (b) which is claimed merely as proceeds of inventory subject to a security interest (G.S. 25-9-306) even though he knows that the specific paper or instrument is subject to the security interest.

§ 25-9-308.

[7] Even if Clipper preserved a security interest in the installment sale contract by retention of the MSOs, a point we do not now decide, and even if Finance can be charged with knowledge

that Clipper so preserved a security interest, Clipper cannot defeat Finance's priority under the provisions of section 25-9-308(a) because Clipper's security interest was not perfected under sections 25-9-304 or 25-9-306. Neither can Clipper defeat Finance's priority under section 25-9-308(b) because Clipper's security interest in the installment sale contract, if any, could be claimed "merely as proceeds of its inventory," the recreational vehicle. We conclude, therefore, that Clipper's security interest in the installment sale contract, if any, is not superior to that of Finance. *See Town and County Mobile Homes, Inc. v. Associates Financial Services Co., Inc.*, No. 74-20-Civ-3 (E.D.N.C. February 1, 1980). *See also* Smith, "Article Nine: Secured Transactions — Perfection and Priorities," 44 N.C. L. Rev. 753, 789-93 (1966).

[8]     Finally we note that Clipper, in a footnote in its brief, suggests that Adventure's assignment of the installment sale contract to Finance was "invalid" because, although signed by Adventure's president, it was not attested or countersigned by Adventure's secretary or assistant secretary. Our Business Corporation Act provides in part with respect to the execution of corporate instruments that:

> [A]ny deed, mortgage, contract, note, evidence of indebtedness, proxy, or other instrument in writing, or any assignment or indorsement thereof, whether heretofore or hereafter executed, when signed in the ordinary course of business on behalf of a corporation by its president, a vice-president or an assistant vice-president and attested or countersigned by its secretary or an assistant secretary, . . . not acting in dual capacity, shall, with respect to the rights of innocent third parties, be as valid as if executed pursuant to authorization from the board of directors, unless the instrument reveals on its face a potential breach of fiduciary obligation.
>
> . . . .
>
> (e) Nothing in this section shall be deemed to exclude the power of any corporate representatives to bind the corporation pursuant to express, implied or apparent authority, ratification, estoppel or otherwise.

N.C. Gen. Stat. § 55-36(a) & (e). Clipper concedes that Adventure "would probably be estopped from asserting the invalidity of the

purported assignment" but that Clipper is "not required to accept [its] validity." Clipper cites no authority for either proposition.

In *George E. Shepard, Jr., Inc. v. Kim, Inc.*, 52 N.C. App. 700, 279 S.E. 2d 858, *disc. rev. denied*, 304 N.C. 392, 285 S.E. 2d 831 (1981), defendant corporation executed a contract for the sale of real property by having its vice-president affix her signature. Attached to the contract was a corporate resolution authorizing the vice-president to sign the contract. The vice-president's signature was not attested by a secretary or an assistant secretary of the corporation. Noting that the vice-president had both express and apparent authority to bind defendant corporation, the Court of Appeals held that the corporation was in fact bound by the contract notwithstanding the failure of its secretary or an assistant secretary to attest or countersign the instrument. The Court of Appeals said:

> G.S. 55-36 protects innocent parties from later assertions by corporations that their contracts were not, in fact, authorized by the corporation's board of directors. Thus, in contracts between corporations and innocent third parties, the statute suspends the ordinary agency rules requiring proof of authority. Subsection (e) clearly shows the statute's remedial nature stating 'nothing in this section shall be deemed to exclude the power of any corporate representatives to bind the corporation pursuant to express, implied, or apparent authority, ratification, estoppel or otherwise.' G.S. 55-36(e).

52 N.C. App. at 707-08, 279 S.E. 2d at 863. We agree with this decision and the rationale for it.

In the instant case it is clear that Adventure's president had apparent authority to bind the corporation by his execution of the assignment. The parties have stipulated that the assignment was on a form regularly used by Adventure in its dealings with Finance and that this particular assignment was executed pursuant to the earlier course of dealing between the parties. There is no place on the assignment portion of the form for attestation or countersignature by a corporate secretary or assistant secretary. Having, pursuant to its course of dealing with Finance, clothed its corporate president with apparent authority to execute assignments like the one here in issue, Adventure is bound by the assignment. Further, the assignment is effective against

all parties, including Clipper, insofar as it passes Adventure's interest to Finance.

Having demonstrated that Clipper had no right to ownership, title, possession, or security interest with respect to the vehicle in question, or the installment sale contract, superior to that of Howerton or Finance, and that in both the vehicle and the installment sale contract Finance's security interests take priority over whatever security interests Clipper might have had in both, we conclude that Finance is entitled to prevail in this case. The decision of the Court of Appeals is, therefore,

Reversed.

Justices MITCHELL, MARTIN and FRYE took no part in the consideration or decision of this case.