NORTH CAROLINA NATIONAL BANK, Intervening Plaintiff v. ROBERT E. ROBINSON and JOANN ROBINSON, Plaintiffs v. BARCLAYS AMERICAN CREDIT, INC. D/B/A BARCLAYS AMERICAN FINANCIAL, Defendant

No. 8514DC187

(Filed 3 December 1985)

1. Automobiles and Other Vehicles § 5; Uniform Commercial Code § 1— ownership of vehicle—purchaser versus inventory finance company—applicability of UCC

The Uniform Commercial Code rather than the Motor Vehicle Act controls in determining whether the purchaser of an automobile or a finance company which has an inventory security agreement with the dealer owns the automobile and who will bear the loss caused by the dealer's failure to pay the finance company money received from the purchaser.

2. Automobiles and Other Vehicles § 5.4; Uniform Commercial Code § 17— title certificate not reassigned—automobile purchaser as buyer in ordinary course of business

An automobile purchaser may be a "buyer in the ordinary course of business" as that term is used in N.C.G.S. § 25-2-403 and § 25-9-307 even though the certificate of title has not yet been reassigned. N.C.G.S. § 25-1-201 (9).

3. Automobiles and Other Vehicles § 5.4; Uniform Commercial Code § 17— automobile in dealer inventory—rights of purchaser superior to inventory finance company

Where a used automobile was held in inventory and displayed for sale by a dealer with no warning that defendant finance company had a security interest in it under an inventory security agreement, defendant finance company had possession of the title certificate which was in the dealer's name, the purchasers received a bill of sale and a twenty-day temporary marker receipt, and

1

**N. C. National Bank v. Robinson**

the dealer failed to pay defendant finance company for the vehicle sold, the purchasers took free of any security interest defendant finance company may have had, N.C.G.S. § 25-9-307(1), and also took whatever title defendant finance company had, N.C.G.S. § 25-2-403. Therefore, the purchasers were entitled to recover possession of the automobile from defendant finance company, and the purchaser's lender was entitled to have its purchase money security interest noted on the certificate of title.

Chief Judge HEDRICK concurring in the result in part and dissenting in part.

APPEAL by plaintiffs and intervening plaintiff from *LaBarre, Judge.* Judgment entered 1 August 1984 in District Court, DURHAM County. Heard in the Court of Appeals 25 September 1985.

*Randall, Yaeger, Woodson, Jervis & Stout, by John C. Randall, for intervening plaintiff appellant.*

*Jimmy D. Sharpe for plaintiff appellants.*

*Pulley, Watson, King & Hofler, P.A., by R. Hayes Hofler, III, for defendant appellee.*

BECTON, Judge.

I

This is a civil action for wrongful conversion of a used automobile and damages for the reasonable rental value of the automobile for the time it was held by defendant, Barclays American Credit, Inc. (Barclays). The plaintiffs, Mr. and Mrs. Robinson, borrowed $4,500 from North Carolina National Bank (NCNB) to buy the automobile from Colclough Auto Sales. NCNB, the intervening plaintiff, seeks a joint and several judgment against the Robinsons and Barclays for $4,500. The Robinsons moved for partial summary judgment on the issue of the ownership of the automobile. Barclays responded with a motion for summary judgment on all issues against NCNB and the Robinsons. From the entry of summary judgment for Barclays, NCNB and the Robinsons appeal. The evidence presented to the trial court tends to show the following.

Barclays and Colclough had a dealer inventory security agreement, in effect since 1 April 1970, under which Barclays would finance used auto purchases by Colclough, and Colclough would execute collateral promissory notes giving Barclays securi-

ty interests in the vehicles. Under this agreement, Colclough could sell a used car at retail in the ordinary course of business provided Colclough would then pay Barclays for the vehicle sold. On 28 February 1983, Barclays loaned Colclough the purchase price of a 1979 Pontiac, and, pursuant to the dealer inventory plan, Colclough executed a collateral promissory note to Barclays and was permitted to display the vehicle on its lot for sale. Barclays retained the title certificate which was in the name of Colclough.

On 2 June 1983, Mr. Robinson negotiated the purchase of the 1979 Pontiac from Colclough. Robinson agreed to pay $1,000 in cash and to obtain a $4,500 loan from NCNB. Neither NCNB nor the Robinsons asked Colclough to produce the certificate of title, but a branch manager from NCNB called Colclough, explained that NCNB was issuing a check to Mr. Robinson and Colclough, and asked that the title show a lien in favor of NCNB. It was not the usual practice at NCNB to inquire about the status of the title in this situation.

Mr. Robinson gave Colclough the $4,500 check and received a bill of sale and a twenty-day temporary marker receipt. Colclough did not transfer the $4,500 to Barclays and did not notify Barclays of the sale of the Pontiac. Barclays' district manager, Mr. Reese, noticed that the Pontiac was gone from Colclough's lot, and he told Mr. Colclough that he had "one day to . . . put the car back on the lot or we would want to be paid." Colclough called Mrs. Robinson and apparently said the car must be returned to Colclough "for the State man to come in and read the odometer." Mr. Robinson, although "completely puzzled" by the request, returned the car. He drove it several times from mid-June to mid-July, but each time parked it at Colclough's lot having been told that the inspector had not yet come.

Upon returning the car from a trip on 19 July 1983, Robinson was met by Reese who asked if Robinson had a title certificate or bill of sale. Robinson said he owned the car, but he could not produce a title or bill of sale. Reese said Barclays had title to the Pontiac and he was taking possession of the car. Robinson did not object and voluntarily surrendered his set of keys to Reese. Reese drove the car to Barclays' office lot, where apparently it remains.

On 16 September 1983, Barclays filed a certificate of repossession with the Department of Motor Vehicles, stating that Barclays had repossessed the car from Colclough on 15 August 1983. A certificate of title was issued for the Pontiac on 19 September 1983 in the name of Barclays.

Plaintiffs could not regain possession of the car and, therefore, discontinued payments to NCNB. Apparently, Mr. Colclough "absconded with the purchase price [$4,500] . . . and subsequently was involuntarily bankrupted."

The Robinsons sued Barclays for wrongful conversion of their car to Barclays' use, and they moved for partial summary judgment on the issue of the ownership of the car. It is clear that this is the ultimate issue in this case. In more stark terms, the question is, who will bear the loss caused by Colclough's failure to pay Barclays? Although we agree with the trial court that there are no material issues of fact for a jury, we disagree with the legal conclusion that Barclays is entitled to the Pontiac. Therefore, we reverse.

## II

The first step in our analysis is to examine the law under the Uniform Commercial Code (UCC) and the Motor Vehicle Act (MVA). This is essential because an examination of these statutes reveals that Barclays will bear the loss in this case if the UCC applies, and the Robinsons will bear the loss if the MVA applies. We begin by examining the MVA.

## A.

When a dealer transfers a vehicle registered under Chapter 20 of the Motor Vehicle Act, it must execute a reassignment and warranty of title on the reverse of the certificate of title "and title to such vehicle shall not pass or vest until such reassignment is executed and the motor vehicle delivered to the transferee." N.C. Gen. Stat. Sec. 20-75 (1983). The dealer must also deliver the duly assigned certificate of title to the transferee or lienholder at the time the vehicle is delivered. *Id.*; *cf. id.* Sec. 20-72(b) (using nearly identical language for transfers of automobile ownership by transferors who are not dealers or insurance companies). Barclays relies on this statute and two 1970 Supreme Court decisions for the proposition that title to a motor vehicle does not pass un-

til (1) the certificate of title has been assigned by the vendor; (2) the certificate has been delivered to the vendee or his agent; and (3) an application has been made for a new certificate of title. *See International Service Insurance Co. v. Iowa National Insurance Co.*, 276 N.C. 243, 251, 172 S.E. 2d 55, 60 (1970); *Nationwide Mutual Insurance Co. v. Hayes*, 276 N.C. 620, 627, 174 S.E. 2d 511, 517 (1970). However, the cases cited by Barclays held only that these three requirements applied from 1 July 1961 through 1 July 1963. In 1963, the General Assembly amended G.S. Secs. 20-72(b) and 20-75 to require the transferor to note in writing on the back of the certificate of title an assignment of title to the transferee. *See* 1963 N.C. Sess. Laws, ch. 552, Secs. 4, 5. There is no longer a requirement under the MVA that a purchaser apply for a new certificate of title before title may pass or vest. *See Hayes*, 276 N.C. at 640, 174 S.E. 2d at 524.

Having discussed the proper analysis of title transfers under G.S. Secs. 20-72(b) and 20-75, we agree with Barclays that the Robinsons did not receive title through the operation of the MVA. They did take delivery of the vehicle, but the certificate of title was not reassigned to them or to NCNB by Colclough. Thus, under the MVA, Barclays would have been within its rights in repossessing the Pontiac, title to which was still in its debtor, Colclough. We now turn to an analysis under the applicable sections of the UCC.

## B.

Barclays' interest in the Pontiac was no more than a security interest at the time of the repossession. *See* N.C. Gen. Stat. Secs. 25-1-201(37) (Cum. Supp. 1985), -2-401(1) (1965); *American Clipper Corp. v. Howerton*, 311 N.C. 151, 166, 316 S.E. 2d 186, 194-95 (1984). Title was in Colclough, and Barclays simply held the certificate of title as security. Barclays did not note its lien on the reverse side of the certificate of title. Nevertheless, Barclays argues that it had a valid lien on the vehicle, apparently arguing that possession of the title certificate to secure a debt is sufficient under the decision in *Wachovia Bank and Trust Co. v. Wayne Finance Co.*, 262 N.C. 711, 138 S.E. 2d 481 (1964). *Wachovia Bank and Trust Co.* is inapplicable because it involved a mortgagee who had retained possession of the vehicle itself, not the certificate of title. In the case at bar, the vehicle was displayed for sale on Colclough's lot.

We also reject the implication in Barclays' argument that the relevant time for determining the rights of the parties is after Barclays took possession of the automobile. This action is for wrongful conversion; we must determine whether the repossession was wrongful in the first place. Thus, we are interested in the rights of the parties at the time of the repossession.

Barclays had a perfected security interest in the Pontiac until its financing statement lapsed in 1975. This is so because the car was held in inventory by a used car business, and thus falls within the provisions of N.C. Gen. Stat. Sec. 20-58.8(b)(3) (1983) and N.C. Gen. Stat. Sec. 25-9-302(3)(b) (Cum. Supp. 1985), and Barclays failed to file a continuation statement as required by N.C. Gen. Stat. Sec. 25-9-403(2) (Cum. Supp. 1985). Our decision is in accord with *Bank of Alamance v. Isley*, 74 N.C. App. 489, 492, 328 S.E. 2d 867, 869 (1985), in which Judge Martin, writing for this Court, noted that Article 9 does not apply to security interests in motor vehicles unless "held as inventory and the security is created by the inventory seller. G.S. 25-9-302(3)(b)." In *Bank of Alamance*, the security interest was created by the purchaser of the car which "was sold in contemplation of regular use on the highway." *Id.* In the case *sub judice*, the car was held for sale in inventory and the inventory seller, Colclough, created the security interest.

Even if Barclays' security interest remained perfected after 1975, the Robinsons would be protected purchasers under the UCC. The Robinsons took free of Barclays' security interest under N.C. Gen. Stat. Sec. 25-9-307(1) (Cum. Supp. 1985): "A buyer in ordinary course of business (subsection (9) of G.S. 25-1-201) . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." A buyer in ordinary course of business is one "who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . . ." G.S. Sec. 25-1-201(9) (Cum. Supp. 1985). As the Official Comment to G.S. Sec. 25-9-307(1) points out, a buyer takes free even if he or she knows of the security interest, as long as the buyer does not know the sale is in violation of some terms of the security agreement.[1] Of-

1. Neither NCNB nor the Robinsons argue that the Pontiac was a "consumer good." Under N.C. Gen. Stat. § 25-9-109(1) (Cum. Supp. 1985), a consumer good is an

ficial Comment 2 notes further that "[i]f the secured party has authorized the sale in the security agreement or otherwise, the buyer takes free without regard to the limitations of this section." Thus, the UCC as adopted in this State protects purchasers in the ordinary course of business from the claims of predecessors in interest who place items into the stream of commerce without warning that they subsequently will claim ownership. This applies in the case at bar because the car was held in inventory and displayed for sale with no warning that Barclays had an interest in it. *Accord Bank of Alamance*, 74 N.C. App. at 493, 328 S.E. 2d at 870 (G.S. Sec. 25-9-307(1) does not apply when the perfection of a security interest in a motor vehicle is governed by Chapter 20.); *Cunningham v. Camelot Motors, Inc.*, 351 A. 2d 402 (N.J. Super. 1975). Barclays' rights are in the proceeds of the sale by Colclough. *See* G.S. Sec. 25-9-306.

A second UCC provision is applicable in this case. Under N.C. Gen. Stat. Sec. 25-2-403 (1965), Barclays "entrusted" the Pontiac to Colclough:

> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

> (3) "Entrusting" includes any delivery and any acquiescence in retention of possession *regardless of any condition expressed between the parties* to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

(Emphasis added.) The General Assembly added a North Carolina Comment relating to Subsection (2):

item "used or bought for use primarily for personal, family or household purposes." As Official Comment 2 notes, goods can be "inventory in the hands of a dealer and consumer goods in the hands of a householder." If the car is a consumer good, the outcome in this case is the same because the Robinsons had no knowledge of Barclays' security interest and the security interest was not properly filed. The result is required by G.S. § 25-9-307(2) which provides:

> In the case of consumer goods, a buyer takes free of a security interest even though perfected if he buys without knowledge of the security interest, for value and for his own personal, family or household purposes unless prior to the purchase the secured party has filed a financing statement covering such goods.

Prior North Carolina law provided that the fact that an owner has entrusted someone with mere possession and control of personal property would not, without more, estop the owner from asserting his title against one who had bought from such possessor (in the absence of some estoppel factor). The UCC, however, protects any purchaser who has bought in the ordinary course of business any item entrusted to a "merchant" who deals in goods of the kind entrusted, whether the merchant had any apparent authority to sell or *whether or not there was any indicium of title.*

(Emphasis added.) In *American Clipper Corp.*, the Supreme Court held, "three essential elements must be present to make this statute operative: (1) an entrustment of goods to (2) a merchant dealing in goods of that kind, followed by a sale by that merchant to (3) a buyer in the ordinary course of business." 311 N.C. at 165, 316 S.E. 2d at 194 (citation omitted).

To the extent Barclays had any ownership interest in the Pontiac, by entrusting the car to Colclough who sold it in the ordinary course of business to the Robinsons, Barclays passed to Colclough the power to transfer that interest to the Robinsons. As the Supreme Court noted in *American Clipper Corp.*, quoting from 3 Anderson, *Uniform Commercial Code*, Sec. 2-403:59, at 600-01 (1971), "[t]he sale by the entrustee makes a definitive transfer of the entruster's title." 311 N.C. at 166, 316 S.E. 2d at 194. The Court then stated:

Once, therefore, a sale has been made by the entrustee to a buyer in ordinary course of business, *title passes from the entruster to the buyer.* The entruster no longer has title. The buyer then has the power to transfer to another the interest he received in the goods.

*Id.* (emphasis added).

The Robinsons took free of any security interest Barclays may have had. G.S. Sec. 25-9-307(1). They also took whatever title Barclays had. G.S. Sec. 25-2-403. Barclays could have protected its interest by noting its security interest on the reverse side of the title and taking steps to assure that potential customers of Colclough would know of Barclays' superior claim. Such a customer then would not be a buyer in the ordinary course of business be-

cause he would have "knowledge that the sale to him is in violation of the ownership rights or security interest of a third party." G.S. Sec. 25-1-201(9).

In sum, under the UCC, the Robinsons would prevail in this action as the rightful owners of the Pontiac at the time of Barclays' repossession.

## III

[1] The final step in our analysis is to determine whether the MVA or the UCC applies in this case. In *Nationwide Mutual Insurance Co. v. Hayes*, 276 N.C. 620, 174 S.E. 2d 511 (1970), the Supreme Court applied the title provisions of the MVA over the UCC. But in that case, the rights of the parties were directly dependent upon when legal title to a vehicle had passed, and neither party had been privy to the actual sale of the vehicle. Two automobile insurance companies were involved; one would have been liable under a "nonowner" policy, the other under an "owner" policy. The Court decided that the MVA applied partly because it comprised "public regulations" and the UCC is "a private law." *Id.* at 639, 174 S.E. 2d at 523. The Supreme Court consistently limited its holding, that the MVA title provisions applied instead of the UCC, to cases involving "tort law and liability insurance coverage." *Id.* at 640, 174 S.E. 2d at 524. The Court also said that the sales act, Article 2 of the UCC, may be applicable to public regulations when a court can define "a clear and concise definitional basis for so doing." *Id.* at 640, 174 S.E. 2d at 523. In *American Clipper Corp.*, the Supreme Court explained its earlier decision and held that, "*Hayes* left open the question whether the MVA, as opposed to the UCC, would control in all circumstances." 311 N.C. at 162, 316 S.E. 2d at 192.

In *American Clipper Corp.*, the Supreme Court reviewed its earlier decisions that involved both UCC and MVA title provisions and noted that the Supreme Court had looked to the prevailing general laws of sales, bailment and entrustment to determine which party had title. *Id.* (discussing *Hawkins v. M & J Finance Corp.*, 238 N.C. 174, 77 S.E. 2d 669 (1953) and *King Homes, Inc. v. Bryson*, 273 N.C. 84, 159 S.E. 2d 329 (1968)). The Court also quoted at length from *Nasco Equipment Co. v. Mason*, 291 N.C. 145, 229 S.E. 2d 278 (1976) to the effect that the UCC, not traditional concepts of title, should control problems that pri-

marily involve security interest disputes. In *American Clipper Corp.*, the dispute involved conflicting security interests among a manufacturer, a dealer, a consumer, and the dealer's finance company. Although the Court of Appeals held that the MVA applied and title to the car could not "pass or vest" until the MVA regulations were satisfied, the Supreme Court reversed and held,

> the provisions of the UCC and not the MVA properly resolve the contest here. As the Court tacitly recognized in both *Hawkins* and *King Homes, Inc.*, the title transfer provisions of the MVA were not designed to resolve the kind of question here presented. The UCC, which generally has supplanted the principles [of sales, bailment and entrustment] relied on in *Hawkins* and *King Homes, Inc.*, was so designed and should have been, but was not, employed by Clipper in this case. For similar holdings from other jurisdictions, see *Wood Chevrolet Company, Inc. v. Bank of the Southeast*, 352 So. 2d [1350] ([Ala.] 1977); *Cunningham v. Camelot Motors, Inc.*, 138 N.J. Super. 489, 351 A. 2d 402 (1975); *Bank of Beulah v. Chase*, 231 N.W. 2d 738 (N.D. 1975).

311 N.C. at 163, 316 S.E. 2d at 192-93.

We conclude that, in this case, the dispute primarily involves a security interest in, and the entrustment of, an automobile. Although the cause of action is the tort of wrongful conversion, the rights of the parties revolve around their relationships as commercial actors. This is not an automobile accident case; rather it involves a business transaction in which the policies underlying the private UCC law are fully implicated.

[2] Therefore, notwithstanding the title transfer provisions of the MVA, we conclude that an automobile purchaser may be a "buyer in the ordinary course of business" as that term is used in G.S. Secs. 25-2-403 and -9-307 even though the certificate of title has not yet been reassigned.[2] Moreover, we believe the MVA pro-

---

2. We recognize that language in *Hayes*, 276 N.C. at 639-40, 174 S.E. 2d at 524, suggests that the UCC was not intended to repeal the provisions of G.S. § 20-72 in the MVA. This is true as far as it goes, but it does not help to resolve specific conflicts. We believe that the case at bar involves a specific instance when the UCC was meant to override the MVA. Indeed, the UCC provides that entrustment may be completed, and title may pass, despite even the larceny of an entrustee. G.S.

visions quoted above which refer to the UCC demonstrate the legislature's intent to have the UCC control issues of security interests and priorities in cases such as the one at bar. The UCC should control over the MVA when automobiles are used as collateral and are held in inventory for sale. *Accord Ramsey National Bank & Trust Co. v. Suburban Sales & Service, Inc.*, 231 N.W 2d 732, 741-42 (N.D. 1975).

[3]   In light of the foregoing, we hold that the Robinsons had the superior right to possession of the Pontiac. They gave value for the car and received a twenty-day temporary marker in June 1983. The car was no longer part of the dealer's inventory when Barclays' agent came to repossess it on 19 July 1983. Thus, the repossession was not from the dealer, but from the Robinsons, and even though it was accomplished without a breach of peace, it was wrongful. Of course, Barclays has rights against its dealer, Colclough.

For the reasons set forth above, the entry of summary judgment in favor of defendant is reversed, and the trial court is directed to enter partial summary judgment in favor of the Robinsons on the issue of the ownership of the automobile. Barclays converted the Pontiac to its own use and had no authority to have the title reassigned to it by the Department of Motor Vehicles. The Robinsons are entitled to possession of the vehicle, and, because the Robinsons' purchase money debt to NCNB is not disputed, NCNB is entitled to have its purchase money security interest noted on the certificate of title. The trial court must still resolve the issue of damages, including, but not limited to, depreciation, rental costs and incidental damages, as a result of the conversion. Finally, the Robinsons and NCNB have abandoned their claim for unfair and deceptive trade practices because it was resolved against them by the trial court and they did not raise and argue it on appeal.

Reversed and remanded.

---

§ 25-2-403(3). Thus, if Colclough had stolen one of Barclays' automobiles, it could have passed title to the Robinsons. In the case at bar, the automobile was in Colclough's name and Colclough only destroyed Barclays' security interest.

Chief Judge HEDRICK dissents.

Judge PARKER concurs.

Chief Judge HEDRICK concurring in the result in part and dissenting in part.

While I would not have treated NCNB's appeal as cavalierly as have my colleagues, I concur in affirming summary judgment for defendant as to any claims alleged by NCNB against defendant. I also question the authority and propriety of this Court's ordering that NCNB's purchase money security interest be noted on the certificate of title when there has been no trial court disposition of NCNB's claims against the Robinsons.

I vote to affirm summary judgment for defendant with respect to the Robinsons' claims.

The Motor Vehicles Act, in pertinent part, provides that when the transferee of a vehicle is a dealer that:

> To assign or transfer title or interest in such vehicle, the dealer . . . shall execute in the presence of a person authorized to administer oaths a reassignment and warranty of title on the reverse of the certificate of title . . . and title to such vehicle shall not pass or vest until such reassignment is executed and the motor vehicle delivered to the transferee.

G.S. 20-75. Under this Act, no title passes to the purchaser of the motor vehicle until the vendor executes an assignment and warranty of title on the reverse of the certificate of title, there is actual or constructive delivery of the motor vehicle, and the duly assigned certificate of title is delivered to the transferee. *See, Insurance Co. v. Hayes*, 276 N.C. 620, 174 S.E. 2d 511 (1970). In enacting the Motor Vehicles Act, the legislature used the word "title" as a synonym for "ownership." *Id.*

In *Hayes*, the Supreme Court held that the provisions of the UCC do not override the motor vehicle statutes relating to the transfer of ownership of a motor vehicle for the purposes of tort law and liability insurance coverage. The Court reasoned that the Motor Vehicles Act contains specific, definite and comprehensive terms concerning the transfer of ownership of an automobile, while the UCC only refers to the passing of title of property de-

scribed as "goods," and that the more specific statute must control.

Plaintiffs and intervening plaintiff distinguish *Hayes* on its facts and contend that even if the Robinsons were not owners for the purposes of the Motor Vehicles Act, they were buyers in ordinary course of business and as such were protected from repossession by Barclays by G.S. 25-9-307(1). This section provides that "[a] buyer in ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." "Buyer in ordinary course of business" is defined as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . . ." G.S. 25-1-201(9). The word "buyer" is not further defined for the purposes of Article 9 of Chapter 25.

As discussed by the Supreme Court in *Hayes*, the Motor Vehicles Act is concerned only with automobiles, and although the word "automobile" falls within the general term of "goods" as defined in the UCC, automobiles are a special class of goods which have long been heavily regulated by public regulatory acts. I hold, therefore, that a purchaser of a motor vehicle is a "buyer" for the purposes of G.S. 25-9-307(1) when he has become an "owner" under the provisions of the Motor Vehicles Act when the old certificate of title has been assigned by the vendor, the motor vehicle has been delivered, and the assigned certificate of title has been delivered to the vendee.

In holding that the UCC, rather than the Motor Vehicles Act, controls in this case, the majority relies upon the recent Supreme Court decision in *American Clipper Corp. v. Howerton*, 311 N.C. 151, 316 S.E. 2d 186 (1984). In that case, the manufacturer of a recreational vehicle retained the manufacturer's certificate of origin after shipping the vehicle to a dealer in an attempt to secure itself against loss by default of the dealer, in violation of G.S. 20-52.1, a provision of the Motor Vehicles Act. The Court held since the statute *required* that the manufacturer supply the transferee with a certificate of origin, the manufacturer could not protect itself from default by retaining the certificate and decided

the priorities of the parties under the provisions of the UCC. In the present case, however, Barclays did not violate a statute by retaining the certificate of title to the vehicle. Thus, the *American Clipper* decision is not controlling in this case.

Additionally, I note that the Robinsons should have had knowledge that the sale of the automobile was in violation of the rights of another party when Colclough failed to assign the certificate of title to them. Obviously, Colclough could not deliver paper title because it was held by defendant Barclays.

It is uncontroverted in this case that the Robinsons never acquired an assigned certificate of title to the Pontiac as required by G.S. 20-75. In my opinion, therefore, the Robinsons were not the "owners" of the vehicle at the time of repossession and thus did not have an interest paramount to that of Barclays under the provisions of the UCC. Therefore, they do not have a claim for conversion against Barclays. Colclough Auto Sales was the "owner" of the automobile, and Mr. Reese validly repossessed it on Colclough's lot pursuant to the security agreement signed on April 1, 1970.

Assuming, however, that the Robinsons were the owners of the automobile and were entitled to the possession thereof, as the majority declares, I cannot agree that there are no genuine issues of material fact with respect to plaintiff's claim for conversion so as to require the trial court to enter summary judgment for plaintiffs on the issue of defendant's liability to plaintiffs for wrongfully converting the automobile. Conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Spinks v. Taylor and Richardson v. Taylor Co.*, 303 N.C. 256, 264, 278 S.E. 2d 501, 506 (1981). To establish a claim for conversion, plaintiff must prove both ownership in himself and the wrongful possession or conversion of the property by defendant. *Gadson v. Toney*, 69 N.C. App. 244, 316 S.E. 2d 320 (1984). Summary judgment is inappropriate where the evidence raises a genuine issue as to whether defendant's possession of plaintiff's property is authorized or wrongful. *Id.* Where defendant has rightfully come into possession of the goods and then refused to surrender them, demand and refusal are necessary to the ex-

istence of a claim for conversion. *Hoch v. Young,* 63 N.C. App. 480, 305 S.E. 2d 201, *disc. rev. denied,* 309 N.C. 632, 308 S.E. 2d 715 (1983).

With respect to the manner in which Barclays got possession of the vehicle Mr. Robinson testified in his deposition as follows:

> Another day I went and got my car, again, and drove to Raleigh, and come back and parked it in the lot and that's the time David come in. He said (pointing to David Reese, manager of Barclays-American), "Mr. Robinson is this your car?" He said "Well you can't get title to it, I have title to it." I said, "Here, I know you want the keys." He said, "I was fixin to ask you for them."

In a second deposition, Mr. Robinson further testified:

> I went back to see Mr. Reese a number of times, several times, but I do not know the exact number. He said he was waiting on Colclough to do something. To pay the money that they owed to Barclays. He has been very nice and I have nothing against that man. Mr. Colclough owed Barclays some money on that car and that's why they were holding the car.

With respect to how Barclays obtained possession of the automobile, Mr. Reese testified in his deposition as follows:

> I went over there and walked up to the car and the gentlemen was getting out of it and I identified myself. I told him I was David Reese with Barclays American Financial across the street and I would like to know what he was doing driving that car. He said that he owned the car. I said what do you mean you own the car? He said that this car belongs to me. I said I want to advise you that Barclays American has the title to the car, that we have a lien on it, that the dealer owes us money on it and that we have an interest in this automobile. I asked him whether he had a bill of sale or could identify any ownership and he said that he could not. He did state that he thought there were some papers in the car at one time, but that they were missing. I told him that I thought he was going to have to talk with Mr. or Mrs. Colclough to verify what was going on and see if they could do anything about it. I said in the meantime, I'm going to take the car over to my office and I'm going to lock it up. He did

not resist me at all. I took out the set of keys and he said, well, here I've got another set of keys to the car. He says, you want these, too? I asked him how he had a set of keys to it and he said he had owned the car previously and had a set that he had never turned in when he traded it back in. And so he just gave me the keys and I told him that he needed to get in touch with the Colcloughs to see if they could work out an agreement.

In the present case, all the evidentiary matter discloses that Barclays came into possession of the automobile rightfully. Mr. Robinson voluntarily surrendered the vehicle to Mr. Reese. The record before us is devoid of any evidence that Barclays wrongfully obtained possession of the automobile or exercised unauthorized control over it. In fact, all of the evidentiary matter contained in this record affirmatively discloses that Barclays' possession of the vehicle was authorized by plaintiffs themselves. In my opinion, summary judgment for plaintiffs on the issue of defendant's liability for wrongful conversion of the automobile would be improper, and on this record summary judgment for defendant on the issue of defendant's liability for wrongful conversion was proper.