DOUGLAS SINGLETARY, III, Plaintiff v. P & A INVESTMENTS, INC. d/b/a ANDY'S MOBILE HOME AND LAND SALES, Defendant

No. COA10-1089

(Filed 7 June 2011)

**1. Uniform Commercial Code— mobile homes—goods—not a part of real estate**

Mobile homes are generally goods in North Carolina, and, given the trial court's findings on severability and relocation, the mobile home in this case was personal property under the Uniform Commercial Code and not a part of the real estate.

**2. Uniform Commercial Code— mobile home—risk of loss— controlled by UCC**

The risk of loss for a mobile home that burned during a sale was controlled by the Uniform Commercial Code (UCC) rather than the North Carolina Motor Vehicle Act. Under the UCC, plaintiff was the owner of the vehicle when it was destroyed.

**3. Motor Vehicles— mobile home—completion of sale—right to resell**

Defendant had the right to sell plaintiff a mobile home even though defendant had not paid consideration and the certificate of title had not been issued at the time of the agreement between defendant and plaintiff. Plaintiff, not defendant, bore the loss of the mobile home when it burned.

Appeal by Defendant from judgment entered 5 May 2010 by Judge W. Erwin Spainhour in Anson County Superior Court. Heard in the Court of Appeals 8 February 2011.

*Carpenter & Flake, PLLC, by Jeffery K. Carpenter, for Plaintiff-Appellee.*

*Gordon, Hicks and Floyd, P.A., by Charles L. Hicks, Jr., for Defendant-Appellant.*

BEASLEY, Judge.

P & A Investments, Inc. d/b/a Andy's Mobile Home and Land Sales (Defendant) appeals from the trial court's judgment in favor of Douglas Singletary, III (Plaintiff), concluding that Defendant seller bore the risk of loss at the time a mobile home purchased by Plaintiff was destroyed by fire and awarding Plaintiff damages. Because we conclude that the Uniform Commercial Code-Sales (UCC or Code) is not supplanted by the Motor Vehicle Act (MVA) in this case and that the UCC's risk of loss provisions therefore govern, we reverse the trial court's judgment.

On 5 February 2008, Plaintiff filed a complaint against Defendant for breach of contract and deceptive trade practice. A bench trial was held on 1 March 2010, where the matter was tried upon stipulated facts as set forth in a pre-trial order filed in open court that same date. The trial court's findings mirror the stipulations to which the parties agreed and establish the factual background of the case, as follows.

This action arises out of an agreement between the parties for the purchase of a mobile home. At all times relevant hereto, Defendant was engaged in the principal business of selling new and used "manufactured homes," and was a "manufactured home dealer," as those terms are defined in N.C. Gen. Stat. § 143-143.9(6) and (7), respectively. On 15 November 2007, Defendant and Vanderbilt Mortgage and Finance, Inc. (Vanderbilt), acting on behalf of Oakwood Acceptance Corp. (Oakwood), contracted to purchase a 1996 Oakwood mobile home for resale. Oakwood had repossessed the "manufactured home" under a chattel mortgage or conditional sales contract from the persons who held title. Defendant, Vanderbilt, and Oakwood were all "merchants" with respect to the sales of manufactured homes under N.C. Gen. Stat. § 25-2-104.

On or about 17 November 2007, Plaintiff entered into a written contract with Defendant for the sale of the same mobile home and

paid the purchase price in full. Although the certificate of title, together with appropriate documentation that would authorize the issuance of a certificate title in the name of any party to whom Defendant sold the mobile home, had not yet been received by Defendant from Vanderbilt, Defendant represented to Plaintiff that it did indeed have the right and authority to sell him the home. In the course of negotiations, Defendant proposed a contractual provision requiring it to relocate the mobile home from its existing location to Plaintiff's property, but Plaintiff ultimately declined the inclusion of such provision. Instead, Plaintiff elected to purchase and accept the mobile home "As is where is," as reflected in the sales contract, rather than bear additional costs for Defendant's assumption of the delivery responsibility. While Defendant failed to attach a separate "Notice of Cancellation" to the contract in duplicate, as required for manufactured home purchase agreements by N.C. Gen. Stat. § 143-143.21A(c), the requisite "right to cancel" statutory language did appear in the contract itself and provided that Plaintiff had three business days after signing the agreement to cancel his mobile home purchase.

Following the execution of the sales contract, on 19 November 2007 Defendant paid Vanderbilt the purchase price of the mobile home in accord with their 15 November agreement, and Plaintiff undertook efforts to arrange for the home to be broken down and moved from its location. Notwithstanding findings that it was located upon a third party's property in North Carolina, and removal of the home's brick and masonry underpinnings was required prior to any relocation thereof, the trial court found that it could be detached from the land without material harm to either the mobile home or the real property. As of midnight on 21 November 2007, the third business day following the execution of the agreement between Plaintiff and Defendant, neither party had expressed any intention to cancel the sale. Moreover, Plaintiff had at no time advised Defendant of any inability to obtain insurance on the home, nor had he requested Defendant's assistance in that regard. In fact, the only communication between the parties from the date of sale through 21 November 2007 was a telephone call on 20 November 2007, during which Plaintiff reported experiencing some difficulties with the owner of the property upon which the mobile home was located while Plaintiff's crew was taking down the underpinning and readying the home for relocation to Plaintiff's property.

On 22 November 2007, the mobile home was destroyed by fire, and in a telephone conference initiated by Plaintiff the following day,

Defendant was informed of the occurrence. Plaintiff demanded return of the funds he had paid Defendant for the purchase of the mobile home, but Defendant refused. Where Defendant had come into possession of the certificate of title to the mobile home and the appropriate documentation for transfer to Plaintiff shortly after 27 November 2007, Defendant diligently requested that Plaintiff cooperate in having the certificate of title issued in Plaintiff's name. Plaintiff, however, refused to provide Defendant with either a driver's license or identification card number, as required by N.C. Gen. Stat. § 20-52(a), and the trial court found that the failure to have a certificate of title to the mobile home issued in Plaintiff's name is the result of Plaintiff's own refusal to cooperate with Defendant in causing the same to be issued.

The trial court concluded that Defendant did not commit an unfair or deceptive trade practice but awarded $22,000, the purchase price of the mobile home in damages to Plaintiff plus interest, based on its conclusion that at the time of the mobile home's destruction, the risk of loss fell on Defendant. Defendant appeals, arguing that the trial court erred in its conclusion of law that Plaintiff did not bear the risk of loss sustained to the mobile home and in its judgment in favor of Plaintiff.

Our standard of review for a judgment following a bench trial, in which the trial court sits without a jury, "is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." *Sessler v. Marsh*, 144 N.C. App. 623, 628, 551 S.E.2d 160, 163 (2001) (citation omitted). "Findings of fact by the trial court in a non-jury trial have the force and effect of a jury verdict and are conclusive on appeal if there is evidence to support those findings. A trial court's conclusions of law, however, are reviewable *de novo*." *Shear v. Stevens Building Co.*, 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992) (internal citation omitted). Here, Defendant does not challenge any of the trial court's findings of fact—which, in any event, were based entirely on the parties' stipulations. Thus, the sole issue on appeal is whether the trial court properly concluded that Plaintiff was not responsible for the destruction of the mobile home because the risk of loss remained upon Defendant.

Plaintiff contended before the trial court, as he does on appeal, that the legal result obtained from application of various UCC provisions is overridden by the North Carolina Motor Vehicle Act, specifi-

cally N.C. Gen. Stat. § 20-72 thereof, as set forth in *Nationwide Mutual Insurance Co. v. Hayes*, 276 N.C. 620, 174 S.E.2d 511 (1970). It is Plaintiff's position that the MVA governs the sales transaction and that no ownership of, title to, or interest in the mobile home passed to him before its destruction because the requirements of *Hayes* had not been met. His contention is that under *Hayes* and the MVA's title transfer provisions, ownership of the mobile home remained with the seller at the time of its destruction, and thus, Defendant bore the loss thereof. Defendant, however, argues that our Supreme Court's decision in *Hayes* is inapposite to the facts of this case and that any conflict that may arise between the applicability of section 20-72 and the UCC, in which the MVA's specific provision would govern, is not present in the case at bar. Accordingly, the UCC's risk of loss provisions, as applied to the parties' agreement, shifted the risk of loss from Defendant merchant-seller to Plaintiff upon the execution of the sales contract. For the following reasons, we agree with Defendant that the issue here, involving risk of loss, is controlled by and resolved through application of the UCC.

**[1]** As an initial matter, before attempting to resolve any conflict between the UCC and MVA, we must determine whether the mobile home sale at issue here comes within the general scope of the UCC in the first place. Where the sales provisions in Article 2 of the UCC apply to "transactions in goods," N.C. Gen. Stat. § 25-2-102 (2009), the law traditionally "treats a mobile home not as an improvement to real property but as a good, defined and controlled by the UCC as something 'movable at the time of identification to the contract for sale,' " *Hensley v. Ray's Motor Co. of Forest City, Inc.*, 158 N.C. App. 261, 264, 580 S.E.2d 721, 723 (2003) (quoting N.C. Gen. Stat. § 25-2-105(1)(2001)); *see also Reece v. Homette Corp.*, 110 N.C. App. 462, 466, 429 S.E.2d 768, 770 (1993) ("The sale of a mobile home is a 'transaction in goods.' ").

> For example, this Court determined a mobile home was a good, the sale of which was controlled as a transaction under the UCC. *Alberti v. Manufactured Homes, Inc.*, 329 N.C. 727, 732, 407 S.E.2d 819, 822 (1991). Moreover, we have "note[d] that prior decisions of this Court and our Supreme Court have classified a mobile home as a 'motor vehicle' for purposes of interpreting the application of our motor vehicle laws to mobile homes." *Hughes v. Young*, 115 N.C. App. 325, 328, 444 S.E.2d 248, 250 (1994) (citing *Peoples Sav. & Loan Ass'n v. Citicorp Acceptance Co.*, 103 N.C. App. 762, 407 S.E.2d 251 (1991); *King Homes, Inc. v. Bryson*, 273 N.C. 84, 159 S.E.2d 329 (1968)).

*Hensley*, 158 N.C. App. at 264, 580 S.E.2d at 723. Indeed, we have acknowledged that mobile homes can be considered realty where a plaintiff shows: (1) that the home was annexed to land with the intent that it be permanent; or (2) demonstrates that circumstances surrounding the association between the land and the mobile home or the relationship between various parties claiming an interest in the item otherwise justifies treating the mobile home as realty affixed to the land. *Id.* at 264, 580 S.E.2d at 723-24 (citing *Hughes*, 115 N.C. App. at 328, 444 S.E.2d at 250). Our determination on the permanence of the mobile home in this case is also guided by the latter portion of the UCC's definition of "goods," which includes "other identified things attached to realty as described in the section on goods to be severed from realty." N.C. Gen. Stat. § 25-2-105(1) (2009). The referenced section provides that when, pursuant to a contract for the sale apart from land, the buyer (or the seller for that matter) is to sever an item attached to realty and is capable of doing so without material harm thereto, that item is a good under the UCC, "and the parties can by identification effect a present sale before severance." N.C. Gen. Stat. § 25-2-107(2) (2009); *see also id.* cmt. ("[I]tems affixed to real property which can be removed without injury to the realty are treated as goods by this subsection of the UCC even though attached at the time the contract is made and without regard to which party (buyer or seller) is to make the severance[,]" and "[w]hether an item is to be deemed 'real' or 'personal' property ('goods') will be determined under the Code by its potential for severability without injury to the realty to which it is attached and not upon the more difficult determination of whether the item is a 'fixture.' ").

Here, although Plaintiff argues on appeal that "the subject matter of this action concerns the purported sale of a mobile home that had been permanently attached to realty with a brick foundation," the parties have stipulated that "the mobile home was located upon the real property in the State of North Carolina of a third party but could be removed therefrom without material harm to either the mobile home or the real property." While the trial court likewise acknowledged that the home was affixed by brick and masonry underpinning, it found, as reflected by the parties' mutual recognition, that severance of the mobile home was achievable without harm to the realty. Where the sales contract clearly contemplated Plaintiff-buyer's removal of the mobile home from the property upon which it was located, and his severance thereof could be done without subjecting the realty to any material harm, the mobile home comes within the

Code's definition of a "good." Plaintiff's only argument concerning permanence is that the mobile home had a brick foundation, but the trial court's finding that Plaintiff undertook removal of the brick and masonry underpinning and arranged for the mobile home to be broken down and relocated further indicates that the home was indeed movable at the time of the parties' agreement. Thus, consistent with our general view that mobile homes are goods, and in light of the trial court's findings regarding the severability and relocation of the home in question by Plaintiff, we conclude that it was not part of the real estate but, rather, personal property and a "good" under the UCC.

[2] Having established that the Code's Article 2 sales provisions do indeed apply, and where both the UCC and MVA deal with the transfer of vehicle ownership, we must determine which statutory compilation will resolve the risk of loss issue in this case. *See* N.C. Gen. Stat. § 20-4.01(23) (2009) (defining "motor vehicle" as "[e]very vehicle which is self-propelled and every vehicle designed to run upon the highways which is pulled by a self-propelled vehicle"); *Bryson*, 273 N.C. at 88-89, 159 S.E.2d at 332 (noting that "[a] mobile home is classified by statute as a motor vehicle" because it "is designed to be operated upon the highways"); *see also In re Meade*, 174 B.R. 49, 51 (Bankr. M.D.N.C. 1994) ("It is clear under North Carolina law that a mobile home is a 'motor vehicle' for purposes of the statutes dealing with registration and ownership of motor vehicles."). The MVA provides, in pertinent part:

> In order to assign or transfer title or interest in any motor vehicle registered under the provisions of this Article, the owner shall execute in the presence of a person authorized to administer oaths an assignment and warranty of title on the reverse of the certificate of title in form approved by the Division, including in such assignment the name and address of the transferee; and no title to any motor vehicle shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee. . . .

> . . . .

> Any person transferring title or interest in a motor vehicle shall deliver the certificate of title duly assigned in accordance with the foregoing provision to the transferee at the time of delivering the vehicle . . . .

N.C. Gen. Stat. § 20-72(b) (2009).[1] North Carolina's adaptation of the UCC "abolishes the traditional 'property passage' or 'title' approach as regards the question of who bears the risk of loss," N.C. Gen. Stat. § 25-2-509 (Commentary) (2009), and states that, if the contract does not provide for the seller's shipment of the goods by carrier or a bailee's holding of the goods for delivery without being moved, and the seller is a merchant, "the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery." N.C. Gen. Stat. § 25-2-509(3) (2009).

The potential for conflict between the transfer of ownership provisions in the MVA and the overlapping subject matter covered by the UCC was first addressed in *Hayes. See Hayes,* 267 N.C. at 632, 174 S.E.2d at 519 (noting issue of first impression in our Courts). Our Supreme Court in *Hayes* was called upon to resolve which of two insurance companies-one providing a "non-owner's" policy and the other, an "owner's" policy-afforded liability coverage for an automobile accident. *See id.* at 622-26, 174 S.E.2d at 512-14. To answer the question, the Court had to fix the date upon which the purchaser of the vehicle acquired an ownership interest therein, which occurred at an earlier point in time under the UCC than under the MVA. *Id.* at 626, 174 S.E.2d at 514. Where "*Hayes* dealt with a situation in which the rights of parties not privy to the sales transaction itself, hinged on the time when legal title to the vehicle passed," *American Clipper Corp. v. Howerton,* 311 N.C. 151, 161, 316 S.E.2d 186, 192 (1984), the Court applied the "public regulations" of the MVA over the conflicting title transfer provisions of the UCC, a "private law," explaining:

> The [UCC], in general, covers transactions in personal property and is particularly related to negotiable instruments, bills of lading and sales in general. The [MVA] is concerned only with the automobile and although the word "automobile" comes within the general term of "goods," automobiles are a special class of goods which have long been heavily regulated by public regulatory acts. In this connection, the official comment to section 25-2-401 seems to say that the [UCC] makes no attempt to set a specific line of

---

1. While N.C. Gen. Stat. § 20-75 excepts a dealer-transferee, such as Defendant in the transaction between it and Vanderbilt, from executing a reassignment and warranty of title to a subsequent transferee "who has the option of cancelling the transfer of the vehicle within 10 days of delivery of the vehicle" until "the end of that period," the three-day cancellation period between Plaintiff and Defendant in this case had expired just prior to the destruction of the mobile home. *See* N.C. Gen. Stat. § 20-75 (2009). Thus, this section does not alter our analysis.

interpretation where a public regulation is involved, but that in case a court should decide to apply this private law definition and reasoning to its public regulation, that there should be a clear and concise definitional basis for so doing. Such comment leads to the conclusion that the sales act, a private law, is not necessarily applicable to public regulations unless the court chooses to make it so.

*Hayes*, 276 N.C. at 638-39, 174 S.E.2d at 523. Where section 20-72(b) of the MVA contains "specific, definite, and comprehensive terms concerning the *transfer of ownership* of a motor vehicle," *Hayes* concluded that *"for purposes of tort law and liability insurance coverage,"* the later-enacted UCC "do[es] not override the earlier Motor Vehicle statutes relating [thereto]." *Id.* at 640, 174 S.E.2d at 524 (emphases added); *see also Batts v. Lumberman's Mut. Cas. Ins. Co.*, 192 N.C. App. 533, 536, 665 S.E.2d 578, 581 (2008) (noting *Hayes's* holding that the word "title" used in section 20-72(b) was intended by the legislature as a synonym for "ownership" such that the two words can be used interchangeably). Thus,

> for purposes of tort law and liability insurance coverage, no ownership passes to the purchaser of a motor vehicle which requires registration under the [MVA] until (1) the owner executes, in the presence of a person authorized to administer oaths, an assignment and warranty of title on the reverse of the certificate of title, including the name and address of the transferee, (2) there is an actual or constructive delivery of the motor vehicle, and (3) the duly assigned certificate of title is delivered to the transferee.

*Hayes*, 276 N.C. at 640, 174 S.E.2d at 524. We acknowledge that this explicit limitation to tort and liability insurance "left open the question whether the MVA, as opposed to the UCC, would control in all circumstances." *American Clipper*, 311 N.C. at 162, 316 S.E.2d at 192. We conclude, however, that Plaintiff's attempt to extend *Hayes* to govern our risk of loss analysis here is not supported by our case law.

Plaintiff's proposition that "[n]o ownership, title, or interest" passed to him as the purchaser of the mobile home because the comprehensive terms provided in N.C. Gen. Stat. § 20-72(b) had not been met might be germane to our analysis if tort law or liability insurance coverage were implicated. *But see N. C. National Bank v. Robinson*, 78 N.C. App. 1, 336 S.E.2d 666 (1985) (declining to apply the MVA even where the cause of action was the tort of wrongful conversion because the dispute primarily involved, "not an automobile accident

case," but, rather, security interest and entrustment issues arising out of "a business transaction in which the policies underlying the private UCC law [were] fully implicated"). The fact that the *Hayes* Court expressly limited its holding to these circumstances has been emphasized by our courts on several occasions. *See, e.g., id.* at 9, 336 S.E.2d at 671 (recognizing that "[t]he Supreme Court [in *Hayes*] consistently limited its holding, that the MVA title provisions applied instead of the UCC, to cases involving 'tort law and liability insurance coverage' "); *Roseboro Ford, Inc. v. Bass,* 77 N.C. App. 363, 366, 335 S.E.2d 214, 216 (1985) (emphasizing this limitation of *Hayes* and concluding that while, "as between vendor and vendee, . . . the vendee does not acquire 'valid owner's liability insurance' " until the vendor transfers or assigns legal title to the vendee, neither "*Hayes* [n]or the general rule concerning *liability insurance* . . . controlling on the [issue] of *collision* insurance coverage here"). While none of our cases distinguishing *Hayes* address the exact risk of loss issue here—most deal with conflicting security interests and have applied Article 9 of the UCC over the ownership requirements of the MVA—various principles articulated therein, often citing *Hayes* itself, support our view that the UCC's sales provisions control the instant dispute. *See, e.g., American Clipper,* 311 N.C. at 151, 316 S.E.2d at 186 (applying the UCC to resolve conflicting security interests in a consignment transaction involving manufacturer, dealer, lender, and buyer of a recreational vehicle, based, in part, on pre-Code reliance on "the general law of sales, bailment and entrustment" in similar transactions).

Our Supreme Court in *American Clipper* revisited its earlier opinion in *Hayes* and explained that *Hayes* did acknowledge the waning importance of title under the UCC, *see American Clipper,* 311 N.C. at 161, 316 S.E.2d at 192; *see also Hayes,* 276 N.C. at 632, 174 S.E.2d at 518 ("The most basic departure from previous law which is found in the Uniform Commercial Code is the abandonment of the concept of title as a tool for resolving sales problems."), but applied the MVA's title transfer provisions over the UCC's general position that the rights and liabilities of the parties to a sales transaction are defined "irrespective of title to the goods," *see* N.C. Gen. Stat. § 25-2-401 (2009) ("Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . . ."). The Court noted that propriety of the *Hayes* decision lies in the relationship of the

insurance companies involved to the nature of the action, as the situation affected "the rights of parties not privy to the sales transaction itself." *American Clipper*, 311 N.C. at 161, 316 S.E.2d at 192; *see also Robinson*, 78 N.C. App. at 9-11, 336 S.E.2d at 671-72 (distinguishing *Hayes's* application of the MVA's "public regulations," where "the rights of the parties were directly dependent upon when legal title to a vehicle passed, and neither party had been privy to the actual sale of the vehicle," from the UCC's displacement of the MVA "when automobiles are used as collateral and are held in inventory for sale" and "issues of security interests and priorities" among parties actually involved in the various transactions are involved).

While neither *American Clipper* nor *Robinson*, both applying the UCC on their facts, are sufficiently on point to control the outcome of this case, these principles are instructive. Thus, where this case presents no issue as to tort liability or automobile liability insurance coverage, and deals with the rights and obligations of the parties directly involved in the sales transaction at issue, their obligations "revolve around their relationships as commercial actors." *Robinson*, 78 N.C. App. at 10, 336 S.E.2d at 672. As such, this case involves a business transaction which fully implicates the policies underlying the private UCC law. *See id.* As our predecessor cases observed in the context of motor vehicle security interests, "the title transfer provisions of the MVA were not designed to resolve the kind of question here presented." *American Clipper*, 311 N.C. at 163, 316 S.E.2d at 193. Thus, the UCC, which supplanted traditional concepts of title as affecting the transfer of interest in and ownership of goods, and the sales provisions codified thereunder, properly resolve the risk of loss contest here. Moreover, Plaintiff's suggestion that, pursuant to *Hayes*, section 20-72 controls, not only the transfer ownership of motor vehicles, but also the interests therein generally—a position that is nowhere articulated in *Hayes*—is untenable in light of our courts' several decisions that have distinguished *Hayes* and analyzed various types of interests in motor vehicles under the UCC.

This Court's decision in *Roseboro Ford* provides further support for applying the UCC in the particular case where the risk of loss in a motor vehicle sales transaction is at issue. In that case, involving an insurance carrier hoping to avoid its obligations to a purchaser of *collision*—not liability-insurance under *Hayes'* proposition that title to the vehicle had not been transferred. *See Roseboro Ford*, 77 N.C. App. 363, 335 S.E.2d 214. Because the "controversy [t]here [did] not involve liability insurance coverage," *Hayes* did not control to add

further conditions to the MVA's general definition of "owner," within N.C. Gen. Stat. § 20-4.01(26), on the date of the accident. *Id.* at 366, 335 S.E.2d at 216; *see also* N.C. Gen. Stat. § 20-4.01(26) (2009) (defining "owner" as "[a] person holding the legal title to a vehicle, or in the event a vehicle is the subject of a chattel mortgage or an agreement for the conditional sale or lease thereof or other like agreement, with the right of purchase upon performance of the conditions stated in the agreement, and with the immediate right of possession vested in the mortgagor, conditional vendee or lessee, said mortgagor, conditional vendee or lessee").

> As owner of the vehicle as defined in G.S. 20-4.01(26), [the purchaser] had an insurable interest in the subject matter to be insured. As a general rule, "anyone has an insurable interest in property who derives a benefit from its existence or would suffer loss from its destruction." 7 Am. Jur. 2d, Automobile Insurance, Section 42 (1980). Pursuant to G.S. 25-2-509(3) *risk of loss passes to the buyer upon receipt of the automobile.* Bass had obligated himself by contract to comply with the terms of the agreement. Following the accident he could not have simply returned the damaged car and walked away.

*Roseboro Ford,* 77 N.C. App. at 367, 335 S.E.2d at 216 (emphasis added).

Similarly, Plaintiff in this case was the "owner" of the motor vehicle on the date the mobile home was destroyed by fire, within the meaning of N.C. Gen. Stat. § 20-4.01(26). Pursuant to section 25-2-509(3) of the UCC, the risk of loss passed to Plaintiff from the merchant-seller Defendant on Plaintiff's receipt of the goods or otherwise, on tender of delivery, which occurred simultaneously due to the "as is where is" nature of the parties' agreement. For, at the time the parties executed the sales agreement, Plaintiff accepted the mobile home at its then-current location, and Defendant concurrently made tender of delivery. Plaintiff thus received delivery of home "as is where is" and obtained possession and control over it. Thus, the risk of loss fell squarely upon Plaintiff when the contract was made. Plaintiff thereupon stood to benefit from the home's existence or suffer loss from its destruction and, accordingly, had an insurable interest in the mobile home.

**[3]** We briefly address Plaintiff's contention that at the time of the parties' agreement on 17 November 2007, Defendant did not have the right to sell him the mobile home in the first place because it did not pay consideration to Vanderbilt until 19 November 2007 and had not

been issued a certificate of title from Oakwood. However, Plaintiff's reliance on the common law of contracts fails to consider the UCC's effect on that sales agreement, which was also characterized as an "as is/where is" contract. We reject Plaintiff's argument that the date of payment between Defendant and Vanderbilt and delivery of the certificate of title were material to the finality of that transaction, which was specifically described in the closing agreement between Defendant and Vanderbilt as a "closed" and "complete" sale on the "effective sale date" of "November 15, 2007" pursuant to various provisions of the UCC and the MVA. *See, e.g.*, N.C. Gen. Stat. § 25-1-201(29) (2009) (defining "purchase" as a "taking by sale, lease, discount, negotiation . . . or any other voluntary transaction creating an interest in property); N.C. Gen. Stat. § 25-2-106(1) (2009) ("A 'sale' consists in the passing of title from the seller to buyer for a price[,]" which, under § 25-2-401, occurs "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods."); N.C. Gen. Stat. § 20-75 ("When the transferee of a vehicle registered under [the MVA] is . . . [a] dealer who is licensed under Article 12 of this Chapter and who holds the vehicle for resale[,]" such as Defendant in this case, "the transferee shall not be required to register the vehicle nor forward the certificate of title to the Division [of Motor Vehicles] . . . .").

In conclusion, we hold that Defendant had the right and authority to sell the mobile home it had purchased from Oakwood/Vanderbilt and that Plaintiff, not Defendant, bore the loss of the mobile home when it was destroyed by fire on 22 November 2007. Thus, we reverse the trial court's judgment awarding Plaintiff $22,000 plus interest at the legal rate and direct that judgment be entered in favor of Defendant.

Reversed.

Judges McGEE and BRYANT concur.